**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JACQUELYN VEITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:19-cv-01065** |
| | ) | |
| **v.** | ) | **JUDGE RICHARDSON** |
| | ) | **MAGISTRATE HOLMES** |
| | ) | |
| **TYSON FRESH MEATS, INC.,** | ) | **JURY DEMAND** |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Tyson Fresh Meats, Inc. ("Tyson") provides this Memorandum of Law in support of its Motion for Summary Judgment. For the reasons discussed herein, Tyson respectfully submits that its Motion for Summary Judgment should be granted and Plaintiff's claims against it should be dismissed.

## I.  SUMMARY OF ARGUMENT

In this lawsuit, Plaintiff asserts claims of disability discrimination and retaliation under the ADA and TDA as well as FMLA interference. (Doc. 1). It is unclear from Plaintiff's Complaint whether she is alleging separate claims for failure to accommodate and discriminatory discharge or whether she is presenting a claim for failure to engage in the interactive process. In an abundance of caution, therefore, Tyson will address all of these theories, all of which fail for the reasons outlined below.

## II. FACTUAL BACKGROUND

### A. Tyson Hires Plaintiff on February 12, 2018 as a Production Supervisor

Tyson hired Plaintiff as a Production Supervisor on B Shift at its Goodlettsville, Tennessee plant on February 12, 2018. (Deposition of Jacquelyn Veith ("Pl. Dep.") at 29:20-22, 30:1-2). In this position, Plaintiff was responsible for meeting production schedules, achieving department and plant objections, and supervising 48 hourly employees who worked on her production lines. (Pl. Dep. at 31:16-23:13, 33:23-25, Exs. 2, 16; Doc. 1, ¶ 8; Deposition of Falah Al-Saadawi ("Al-Saadawi Dep.") at 12:15-18). Plaintiff's position required her to be present when production was running. (Pl. Dep. at 42:6-13; Deposition of Scott Kuck ("Kuck Dep.") at 42:7-10). On B Shift, production typically ran from 2:00 PM until 11:00 PM. (Pl. Dep. at 30:17-31:2).

When production stopped for the night, Plaintiff performed her "other supervisory duties," which included drafting detailed reports about her lines' efficiencies, quality issues, and overall performance. (Pl. Dep. at 30:22-31:2, 39:23-41:4). Plaintiff's supervisory duties also included handling disciplinary issues, vacation and leave requests, and time and attendance for her hourly employees. (Pl. Dep. at 30:22-31:25, 39:23-41:4; Al-Saadawi Dep. at 17:3-10). As a result, Plaintiff frequently left the plant after 2:00 AM and worked between 70 to 80 hours a week. (Pl. Dep. at 30:22-31:6, 36:6-9). Plaintiff worked late because of her "supervisory responsibilities postproduction." (Pl. Dep. at 40:3-6). Plaintiff described a typical night as "very fast-paced" with "very" high demands. (Pl. Dep. at 35:20-24).

In addition to the late hours, Plaintiff's position occasionally required her to work six

days per week. (Pl. Dep. at 31:7-13, 108:8-18).[1] Plaintiff was informed of this requirement when she was hired. (Pl. Dep. at 30:7-16, 31:7-13, 41:5-13). Whether production would run six (or sometimes seven) days per week depended on customer demand, which varied. (Pl. Dep. at 41:18-42:5; Al-Saadawi Dep. at 20:8-11, 20:19-24; Kuck Dep. at 42:4-10, 44:6-9; Deposition of Gary Denton ("Denton Dep.") at 11:10-24). If customer demand was high, then the production demands increased proportionately. (Pl. Dep. at 41:18-24).

Plaintiff's work schedule was hard on Plaintiff and her family. (Pl. Dep. at 37:22-18). Plaintiff's son was two-years old at the time and Plaintiff's husband was on active duty in the U.S. Army, deployed overseas. (Pl. Dep. at 16:8-18:3, 37:17-21). Moreover, Plaintiff lived in Clarksville, Tennessee and commuted two hours each night. (Pl. Dep. at 37:12-16). As a result of these factors, Plaintiff missed family activities and struggled to find a work-life balance. (Pl. Dep. at 37:22-38:18).

### B. Plaintiff's Tense Relationship with Her Co-Workers Deteriorates and Her Work Environment Becomes Too Stressful Following a Leadership Change

For most of her employment, Plaintiff reported to General Manager Molly Winkle ("Winkle"). (Pl. Dep. at 34:18-20, 36:18-20, 53:19-20). Plaintiff considered Winkle a confidant and key member of her support system. (Pl. Dep. at 97:4-11, 127:22-128:1). In October 2018, however, Plaintiff started reporting to a newly-promoted General Manager, Kim Jal ("Jal"). (Pl. Dep. at 45:23-46:7; Deposition of Kim Jal ("Jal Dep.") 7:7-10). Although Plaintiff got along with Jal on a personal level, she considered his management style less collaborative than Winkle's. (Pl. Dep. at 54:3-14, 97:4-18).

---

[1] At the start of her employment, Plaintiff worked six days a week for three months straight. (Pl. Dep. at 31:7-13)

Plaintiff's already tense relationship with her co-workers worsened after Jal's promotion. (Pl. Dep. at 50:12-21, 51:7-21, 53:23-24, Ex. 4). Plaintiff felt ignored and isolated. (Pl. Dep. at 51:7-21). Then, on October 26, 2018, an incident occurred between Plaintiff and fellow Production Supervisor Elizabeth Fournier ("Fournier"), which Plaintiff reported to Human Resources. (Pl. Dep. at 49:1-50:21, 61:23-62:13, Ex. 4; *see also* Ex. 30 to Kuck Dep.). On this occasion, Plaintiff entered the supervisors' office where perfume was being sprayed. (Pl. Dep. at 50:22-25, Ex. 4). Plaintiff, who has allergies, asked her fellow production supervisors to stop spraying the perfume. (Pl. Dep. at 50:24-25, Ex. 4). Fournier responded, "quick, spray more." (Pl. Dep. at 51:1, Ex. 4). Plaintiff felt that Fournier's response was "hostile and unnecessary and it really upset [her]." (Pl. Dep. at 51:1-3). Plaintiff met with Human Resources Manager Scott Kuck ("Kuck") about the incident and Kuck addressed the comment with Fournier. (Pl. Dep. at 66:11-67:11).

At some point after the perfume incident, Jal asked Plaintiff to run a product on her production lines that A Shift was unable to finish. (Pl. Dep. at 55:2-10, 57:19-20). This assignment caused Plaintiff a great deal of stress, in part, because she was concerned that her team would not run the product correctly. (Pl. Dep. at 55:5-14, 56:12-16, 57:13-15, 57:25-58:4). When Plaintiff tried to discuss her concerns with Jal, he responded "nah, it will be fine, just run it." (Pl. Dep. at 55:9-10). Plaintiff was upset that Jal did not spend time talking with her about her concerns. (Pl. Dep. at 58:18-24). Plaintiff ended up running the product and Jal assigned other production supervisors to assist her team. (Pl. Dep. at 59:2-11). Nevertheless, Plaintiff felt a lack of camaraderie. (Pl. Dep. at 59:10-11, 60:19).

Plaintiff described this event as the "beginning of the end" and led Plaintiff to the realization that her work environment was too stressful. (Pl. Dep. at 57:5-9, 96:1-2). She explained:

> It all compounded on each other. I had a supervisor that wasn't allowing me to voice my concerns and help me work through it together. I had coworkers that were not willing to work with me, and so all of that together just made it so stressful that I just –I couldn't handle it anymore. I needed at least something to give. And if my supervisor wouldn't listen to me and I didn't have any team members to depend on, I felt like an island unto myself and I knew it was just – it was too stressful, and that's when I knew I had to reach out to a professional for help.

(Pl. Dep. at 68:18-69:3). Plaintiff admits that she enjoyed her job and felt it was a good fit for her when she reported to Winkle. (Pl. Dep. at 127:22-23). After Jal became her supervisor, however, her feelings changed. (Pl. Dep. at 127:24-128:1, 128:11-19).

### C. Plaintiff Requests Leave Under Tyson's Leave of Absence Policy

Tyson's Leave of Absence policy provides three months of leave to employees who have worked for the company for at least three months but less than 12 months. (Pl. Dep. at 72:24-73:7, Ex. 6). Plaintiff was trained on this policy when she was hired and she understood that her tenure allowed her to take three months of leave. (Pl. Dep. at 72:13-73:7, Exs. 3, 6).

On November 11, 2918, Plaintiff gave Tyson a note from therapist Bethanie Hiramoto at the Ross Center. (Ex. 9 to Pl. Dep.). The note said that Plaintiff needed to be off work from November 12, 2018 to November 19, 2018. (Pl. Dep. at 79:7-80:6, Ex. 9). Tyson approved this request for time off and Plaintiff was granted a leave of absence. (Pl. Dep. at 80:24-25). On November 18, 2018, the day before Plaintiff was expected to return to work, Plaintiff gave Tyson a second note from Ms. Hiramoto, which requested an extension of her leave to December 11, 2018. (Pl. Dep. at 82:1-11, Ex. 10). Tyson granted this request. (Pl. Dep. at 82:1-11, Ex. 10). On December 9, 2018, Plaintiff gave Tyson a third note from Ms. Hiramoto, which requested a

further extension of her leave of absence to January 7, 2019. (Pl. Dep. at 85:4-21, Ex. 11). Tyson approved this request as well. (Pl. Dep. at 85:4-21, Ex. 11).

On January 4, 2019, Plaintiff provided a fourth note from Ms. Hiromoto, this one requesting a further extension of her leave through February 4, 2019. (Pl. Dep. at 86:13-21, Ex. 12). Plaintiff, however, had already exhausted her three months of available leave by January 15, 2019. (Kuck Dep. at 27:5-17, 75:12-21, 76:23-25; Pl. Dep. at 87:12-21, Ex. 6). Plaintiff had previously taken leave from August 29, 2018 to September 24, 2018 for a non-work related injury. (Pl. Dep. at 75:8-10, 76:9-22, Ex. 20).[2]

Ms. Hiromoto's notes did not contain any information about Plaintiff's medical condition or reasons for treatment. (Exs. 9-12 to Pl. Dep.). While Plaintiff was on leave in November 2018, however, she submitted short-term disability paperwork to Tyson in which she represented that her condition rendered her unable to perform her "supervisory functions." (Pl. Dep. at 84:14-20, Redacted Excerpt of Ex. 5 to Deposition of Bethanie Hiramoto ("Hiramoto Dep."), Bates numbered Veith 000148).[3]

### D. After Exhausting Her Available Leave, Plaintiff Submits a Request for Accommodation on January 15, 2019

On January 15, 2019, Plaintiff sent Kuck an email requesting three accommodations that she would need to return to work:

---

[2] Plaintiff admits that Tyson had always accommodated her. (Pl. Dep. at 101:3-4). For example, when Plaintiff returned to work after a surgery in September 2018, Tyson accommodated her restrictions. (Pl. Dep. at 77:12-17). Later, on November 5, 2018, Plaintiff requested accommodations for numbness in her arms, which Tyson also provided. (Pl. Dep. at 78:5-79:1, Ex. 8).

[3] Tyson filed a redacted excerpt of Plaintiff's short-term disability application to remove Plaintiff's personal health information.

> Scott,
>
> I have attached my treatment summary from my provider which is requesting a few accommodations before I return to work on Feb. 4, 2019. She is requesting three accommodations: A shift schedule, no more than a five day work week and that I be permitted to attend all therapy and medication management appointments.

(Pl. Dep. at 92:1-11, Ex. 21). The treatment summary that Plaintiff referenced in and attached to her email to Kuck provided in penitent part:

> Mrs. Veith is a 38-year-old Caucasian female who is currently in therapy to work on her concerns as it pertains to her high levels of stress, emotional control, and overwhelming thoughts. . . . The client has expressed concern with her returning to work as it may increase overwhelming thoughts and hinder her progress in therapy. These concerns have been addressed by the discussion of restrictions and accommodations to return to work. . . . the therapist recommends the client will need to be accommodated on a normalized schedule (ex. A shift), keep working days to five days a week max, and be able to attend therapy and medication management appointments.

(Pl. Dep. at 95:10-14, Ex. 21).

Ms. Hiramoto testified that when she wrote "normalized schedule" on the treatment summary she was communicating that Plaintiff needed to work during the daytime, on A Shift. (Hiramoto Dep. at 71:7-10, 75:12-16). Ms. Hiramoto further testified that when she wrote "normalized schedule" on the treatment summary she likely meant work hours between 9:00 AM to 5:00 PM. (Hiramoto Dep. at 74:18-25). Moreover, Ms. Hiramoto considered the accommodations that she outlined in her treatment summary to be restrictions that were necessary preconditions to Plaintiff's return to work. (Hiramoto Dep. at 69:2-14; Pl. Dep. at 95:19-23).

### E. Plaintiff Meets with Scott Kuck and Operations Manager Falah Al-Saadawi to Discuss Her Request for Accommodations

After receiving Plaintiff's email, Tyson Human Resources scheduled a meeting with her. (Pl. Dep. at 100:17-24; Kuck Dep. at 38:2-5). Plaintiff met with Kuck and Operations Manager Falah Al-Saadawi ("Al-Saadawi") on January 18, 2019. (Pl. Dep. at 101:7-11; Al-Saadawi Dep.

7

at 7:9-11, 24:18-25:22; Ex. 25 to Kuck Dep.). In this meeting, Plaintiff's accommodation requests were discussed. (Pl. Dep. at 103:7-20, 171:24-172:11; Kuck Dep. at 49:22-50:2, Ex. 26; Al-Saadawi Dep. at 31:8-11).

Based on Plaintiff's prior communications and comments during the meeting, Kuck and Al-Saadawi understood that Plaintiff wanted an A Shift position. (Al-Saadawi 25:15-17, 29:9-13; Kuck Dep. at 40:25-41:6, 41:1-14, Ex. 25; Ex. 21 to Pl. Dep.). They also discussed Plaintiff's request to work – at most – five days a week and reduced hours. (Al-Saadawi 25:15-22, 32:10-16; Ex. 25 to Kuck Dep.). In fact, Plaintiff said during the meeting that she needed to keep her working hours limited to eight hours per day. (Al-Saadawi 25:15-22, 32:10-16; Denton Dep. at 26:9-12, 29:12-17, 32:16-17).

Plaintiff admits that she wanted to return to work as a Production Supervisor. (Pl. Dep. at 114:16-17). As Kuck and Al-Saadawi explained to Plaintiff in the meeting, however, there were no A Shift Production Supervisor positions open at the time. (Al-Saadawi 29:11-12, 34:7-20; Kuck Dep. at 72:12-17, 88:21-89:2, Exs. 25-26; *see also* Pl. Dep. at 124:17-20). In fact, there were no open A Shift management positions at all at the time. (Exs. 25-26 to Kuck Dep.; Denton Dep. at 25:2-4; *see also* Pl. Dep. at 136:2-13, 114:10-17). Prior to the January 18, 2019 meeting, Kuck ran the plant's open positions report, which he reviewed with Plaintiff during their meeting. (Pl. Dep. at 103:7-21, 172:6-8; Kuck Dep. at 49:22-50:2, 88:21-89:25, Exs. 25-26).

In response, Plaintiff said that she would be willing to step down from a management position. (Kuck Dep. at 72:1-3, Ex. 25). As a result, Kuck ran the open non-management positions report and walked through those openings with Plaintiff. (Kuck Dep. at 72:1-11, Exs. 25-26; Pl. Dep. at 119:1-18). The only non-management openings on A Shift were interpreter

positions and food safety quality assurance ("FSQA") positions. (Kuck Dep. at 50:1-2, 72:1-11, Exs. 25-26). Tyson offered Plaintiff an FSQA position during the meeting, but she declined it because she thought the pay was too low. (Pl. Dep. at 103:18-21, 104:6-7; Al Saadawi Dep. at 34:7-20, Kuck Dep. at 72:4-11; Denton Dep. at 24:19-25). At the end of the meeting, Plaintiff's employment was terminated because she had exhausted her three months of available leave and there were not any open positions that met Plaintiff's proposed accommodations or that she would accept. (Kuck Dep. at 51:21-52:2; Al-Saadawi Dep. at 34:7-20; Pl. Dep. at 87:12-21, 91:19-25; Denton Dep. at 50:2-6).[4]

The intent of this meeting with Plaintiff was not to terminate Plaintiff's employment, but instead to explore options and discuss whether there were any open positions that met her proposed accommodations. (Al-Saadawi Dep. at 30:19-21, 34:1-4; Kuck Dep. at 95:14-17; Denton Dep. at 22:24-23:7, 42:10-14). Tyson confirmed that no A Shift Production Supervisor positions were available and Plaintiff declined the FSQA position that she was offered. (Kuck Dep. at 71:24-72:11, Exs. 25-26; Al-Saadawi Dep. at 30:3-4, 34:12-14; Denton Dep. at 24:19-25; Pl. Dep. 103:18-21, 104:6-7). Moreover, Tyson concluded that it was unreasonable to reduce a Production Supervisor's work schedule to an eight-hour day and five-day work week. (Denton Dep. at 51:16-18; Kuck Dep. at 42:7-10). Kuck explained that this type of an accommodation would require other employees to routinely take on Plaintiff's supervisory work. (Kuck Dep. at 57:5-9, 65:7-11, 73:1-7; Al-Saadawi Dep. at 30:9-11).

---

[4] Plaintiff argues that her leave of absence was approved through February 4, 2019. (Pl. Dep. at 87:22-25). Plaintiff's belief is premised solely on an auto-generated letter prepared by Tyson's corporate office. (Pl. Dep. at 91:8-12, Ex. 13; Kuck Dep. at 21:13-21). Tyson's corporate office generated this letter upon receiving information that she had requested a fourth extension of her leave of absence. (Kuck Dep. at 27:6-8, 76:14-19). The letter was generated by mistake as neither the plant's Benefits Coordinator nor Human Resources realized Plaintiff's leave was exhausted under the policy at the time the letter was sent. (Kuck Dep. at 75:23-76:5, 77:6-7; Denton Dep. at 53:5-12).

Plaintiff argues that during the meeting she made suggestions that Tyson rejected. (Pl. Dep. at 215:23-216:15). Plaintiff claims that she asked if Tyson could place her in a "floater" position. (Pl. Dep. at 171:19-23, 216:4-5). Tyson has two Floater Supervisor positions; one on A Shift and one on B Shift. (Al-Saadawi Dep. at 14:2-3, 16:14-15; Kuck Dep. at 54:13-15; Pl. Dep. at 171:22). Neither position was open at the time. (Kuck Dep. at 54:23-25). Moreover, Floating Supervisor positions are reserved for senior and experienced supervisors who are being groomed for promotions to General Manager. (Al-Saadawi Dep. at 14:2-3, 16:5-17; Kuck Dep. at 16-19, 54:20-21).

Plaintiff also claims that during the meeting she asked for (1) some time to obtain clarification from her therapist about what she meant by a "normalized" schedule, or (2) more time to determine if her therapist would change her proposed accommodations. (Pl. Dep. at 103:23-104:3, 136:17-137:9, 216:6-10). Further, Plaintiff claims that she asked "for a little bit of time" to adjust to her medication. (Pl. Dep. at 105:2-11). Plaintiff admits, however, that prior to the meeting she had not discussed with her therapist whether her proposed accommodations were flexible. (Pl. Dep. at 121:1-15). Plaintiff further admits that she did not obtain modified accommodation requests after her meeting with Tyson. (Pl. Dep. at 121:18-21).

Kuck understood that all three accommodations in the treatment summary were presented as conditions to Plaintiff's return to work. (Kuck Dep. at 39:23-25). He explained that he did not need clarification on Plaintiff's requested accommodations, and that the treatment summary was straightforward. (Kuck Dep. at 40:14-20; *see also* Ex. 21 to Pl. Dep.). Moreover, additional time for Plaintiff to adjust to her medication would not change the limitations placed on her workload. (Kuck Dep. at 41:19-25; Denton Dep. at 38:22-39:9; Al-Saadawi Dep. at 31:8-32:19).

Plaintiff admits that her treatment summary did not state that she could return to work if Tyson satisfied only one of the three accommodations requested. (Plaintiff Dep. at 100:14-16).

### F. Plaintiff's Testimony Establishes that She Wanted Less Work and Undermines Her Claim that She is Disabled

Plaintiff's alleged disability is "depression and acute anxiety," which are diagnoses made by Ms. Hiramoto. (Pl. Dep. at 138:17-20).[5] When asked how her condition affects her, Plaintiff testified, in pertinent part, " . . .most of the time it doesn't really bother me at all and its fine. Even with stress, I'm usually okay. . . ." (Pl. Dep. at 140:13-16). When asked in what ways her condition affects her daily activities, Plaintiff responded:

> On the normal every day doing my life, going to work, normally no. Honestly, prior to the incidents that we've talked about that have led up to me going out, prior to all of that, I was always able to handle – not knowing its depression, I was always able to handle whatever feelings I was feeling. I was always able to keep it in check and continue doing my job whatever job that was, whether it be Tyson, USDA, retail, whatever. It didn't matter. I was always able to keep it all in check.

(Pl. Dep. at 141:4-15). Plaintiff's counsel tried to rehabilitate this testimony as follows:

> Q. Okay. Now, earlier you were asked about how your disability affects your daily activities and that was not really defined. And so I'm going to ask you about a few things with respect to your depression and your anxiety, and you just tell me if it affected these things.
>
> . . .
>
> Q. When you were having a flare-up of your depression and/or anxiety, did it affect your ability to care for yourself.
>
> A. No.

(Pl. Dep. at 210:13-24).

---

[5] Ms. Hiramoto denies diagnosing Plaintiff with depression and "acute anxiety." (Hiramoto 39:9-11, 26:1-12). In her view, she diagnosed Plaintiff with an unspecified anxiety disorder after meeting with her for one 60-minute intake session in which the underlying basis of why Plaintiff was presenting for treatment was not even explored. (Hiramoto Dep. at 21:9-23, 26:1-12).

In addition, Plaintiff testified that during therapy, Ms. Hiramoto hypothesized that production work may be too stressful for Plaintiff, and that she should consider looking for a new job. (Pl. Dep. at 147:12-14). Plaintiff admits that the motivation behind her requested accommodations was for Tyson to accommodate her work-life balance that she desired by decreasing her work load:

> I just – I needed some sort of routine so I could try to get –one, I could get a break from the stress because the work was incredibly stressful, and then with everything else on top of it, it was a lot. **And also to try to get that work-life balance because,** in addition to all of the stress I was feeling within the plant for a variety of reasons we've already talked about, I also had that whole stress of like **I work and then I work, and that's it**.

(Pl. Dep. at 125:14-22).

### III.    LEGAL ANALYSIS

### A.  Plaintiff's FMLA Interference Claim Fails as a Matter of Law

Plaintiff claims that Tyson's actions constitute interference with the FMLA. (Doc. 1, ¶ 53). To prevail under an interference theory, Plaintiff must prove that: (1) she was an eligible employee; (2) Tyson is a covered employer; (3) she was entitled to leave under the FMLA; (4) she gave Tyson notice of her intent to take leave; and (5) Tyson denied her FMLA benefits to which she was entitled. *Demyanovich v. Cadon Plating & Coatings, LLC,* 747 F.3d 419, 427 (6th Cir. 2014).[6] Plaintiff's interference claim fails because (1) Plaintiff was not an eligible employee; (2) she did not provide Tyson with notice of her intent to take FMLA leave; and (3) her claim is based on nothing more than speculation, which is insufficient as a matter of law.

---

[6] Courts apply the *McDonnell Douglas* burden-shifting framework to claims for FMLA interference. *Id.*

### 1.  Plaintiff Was Not Eligible for FMLA Leave

It is well established in the Sixth Circuit that the plaintiff bears the burden of establishing eligibility for FMLA leave.  *See Massengill v. Anderson Cty. Bd. of Educ.*, 478 F. Supp. 2d 1004, 1007 (E.D. Tenn. 2007).  If a plaintiff is not eligible for FMLA leave, she cannot maintain a cause of action for FMLA interference.  *See Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004) (holding that FMLA eligibility is a prerequisite to suit for interference or retaliation claims).  Plaintiff was hired on February 12, 2018 and her termination occurred on January 18, 2019.  (Pl. Dep. at 29:20, 161:19-21).  It is undisputed that Plaintiff worked for Tyson less than 12 months.  Accordingly, she was not an eligible employee covered under the FMLA. *See Banerjee v. Univ. of Tenn.*, No. 19-6009, 2020 WL 3485818, at *4 (6th Cir. June 26, 2020) (citing § 2611(2)(A) (defining "eligible employee" as "an employee who has been employed . . . for at least 12 months by the employer with respect to whom leave is requested . . . .").

Faced with these facts, Plaintiff argues that Tyson interfered with her rights by preemptively terminating her employment before she became eligible for FMLA leave.  (Doc 1, ¶¶ 49-52; Pl. Dep. at 173:3-9).  The Sixth Circuit, however, does not recognize a "preemptive termination" theory, therefore Plaintiff's claim fails as a matter of law.  *See Banerjee,* 2020 WL 3485818, at *4 (holding that the FMLA does not protect leave requests made by ineligible employees, even for post-eligibility leave).

### 2.  Plaintiff Cannot Prove She Notified Tyson of Her Intent to Take FMLA Leave

Plaintiff's FMLA interference claim also fails because she did not provide Tyson with notice of her intent to take FMLA leave.  To invoke FMLA protections, an employee must "request leave and give the employer notice that he is requesting such leave for a serious health

condition that renders him unable to perform his position's duties." *Brenneman v. MedCentral Health System,* 366 F.3d 412, 421 (6th Cir. 2004) (citations omitted). Even if the Sixth Circuit recognized of "preemptive termination" theory (which is does not), Plaintiff is still required to establish that she notified Tyson of her intent to take FMLA leave.

Here, the undisputed facts establish that Plaintiff did not request FMLA leave nor did she notify Tyson of her intent to take FMLA leave after she became FMLA-eligible. To the contrary, Plaintiff admits (1) that she intended to return to work on February 4, 2019 (Pl. Dep. at 173:5-6), and (2) that she had no intention of taking additional leave. (Pl. Dep. at 174:1-3). In light of these admissions, Plaintiff cannot prove that she gave Tyson notice of her intent to take FMLA leave after she became eligible on February 12, 2019.

### 3. Plaintiff Interference Claim Is Premised on Speculation

Finally, Plaintiff's FMLA interference claim fails because her argument that Tyson terminated her employment to prevent her from taking FMLA leave on or after February 12, 2019 is based on nothing more than rank speculation. There is simply no factual support for this argument, and in fact Plaintiff's testimony contradicts it for the reason stated above.

For all of these reasons, Plaintiff's FMLA interference claim fails as a matter of law and should be dismissed.

### B. Plaintiff's ADA Accommodation Claim Fails as a Matter of Law

Plaintiff also alleges that Tyson violated the ADA by refusing to accommodate her. (Doc. 1). To establish a failure to accommodate claim, a plaintiff must show that: (1) she is an individual with a disability, and (2) she is otherwise qualified for her job despite the disability (a) without accommodation from the employer, (b) with an alleged "essential" job requirement eliminated, or (c) with a proposed reasonable accommodation. *Tchankpa v. Ascena Retail*

*Group, Inc.*, 951 F.3d 805, 811 (6th Cir. 2020); *Wyatt v. Nissan North America, Inc.*, No. 3:17-cv-1545, 2019 WL 6682197, at *12 (M.D. Tenn. Dec. 6, 2019). If a plaintiff establishes these elements, then the defendant bears the burden of proving that a challenged job criterion is essential or that a proposed accommodation will impose an undue hardship on the defendant. *Id.*

Plaintiff's failure to accommodate claim fails as a matter of law because (1) Plaintiff is not a qualified individual with a disability, and (2) Plaintiff's requested accommodations were not reasonable.

### 1. Plaintiff is Not a Qualified Individual with a Disability

Even if Plaintiff can show she has a disability, she cannot establish that she was a "qualified individual" because she cannot perform the essential functions of her job, with or without reasonable accommodation. *See* 42 U.S.C. § 12111(8). A job function is essential if its removal would fundamentally alter the position. *Wyatt*, 2019 WL 6682197, at *12. If a plaintiff's disability renders her unable to perform an essential function of her job, then she is not a "qualified individual" protected by the ADA. *Id.*

Plaintiff worked as a production supervisor on B Shift. The essential functions of that job included supervising 48 hourly employees during the night shift while production was running plus completing all of her postproduction supervisory duties. (Pl. Dep. at 30:22-31:2, 31:16-23:13, 33:23-25, 24:6-13, 39:23-41:4, Ex. 2). Plaintiff admits that these job duties required her to work 70 to 80 hours a week, and occasionally 6 days per week. (Pl. Dep. 30:22-31:13, 36:6-9, 108:8-18).

By her own admission, Plaintiff's condition rendered her unable to perform the essential supervisory functions and the accommodations requested by her therapist confirmed this point. As a result, Plaintiff communicated to Tyson that she needed to work A Shift and that she needed

to work reduced hours per day and a maximum of only 5 days per week. (Ex. 21 to Pl. Dep., Al-Saadawi 25:15-17, 32:10-16; Ex. 25 to Kuck Dep.). In light of these restrictions, Plaintiff was unable to perform the essential functions of her position as a B Shift Production Supervisor. Production Supervisors on B shift must work nights, supervise production that runs on occasion 6 days per week, and perform postproduction supervisory functions that require 70 to 80 hours per week. (Pl. Dep. at 30:17-31:13, 40:3-6, 46:6-13, 108:8-18, Ex. 2; Kuck Dep. at 42:7-10).

As a result, a fundamental piece of Plaintiff's accommodation request was a transfer to A Shift. (Ex. 21 to Pl. Dep.). To overcome summary judgment, a plaintiff generally must identify the specific job she seeks and demonstrate that she is qualified for the position. *Rorrer v. City of Stow,* 743 F.3d 1025, 1040 (6th Cir. 2014) (citations omitted). Plaintiff admits that she wanted to return to work at Tyson as a Production Supervisor. (Pl. Dep. at 114:16-17). It is undisputed, however, that Tyson did not have an open Production Supervisor position on A Shift at relevant times. *See Rorrer,* 743 F.3d at 1040 (noting that an employer need only reassign an employee to a vacant position).

In fact, the only open A Shift positions at the time were for interpreters and FSQA techs. Plaintiff did not possess the necessary qualifications to work as an interpreter and she declined the FSQA position due to pay. (Pl. Dep. at 103:18-21, 104:6-7). An employer may reassign an employee to a lower grade and paid position if the employee cannot be accommodated in the current position and a comparable position is not available. *See Giles v. Wilson Cty. Bd. of Educ.*, No. 1:17-CV-896, 2018 WL 4680335, at *9 (M.D. Tenn. Sept. 28, 2018).

Further, Plaintiff cannot be considered a "qualified individual with a disability" in light of her decision to decline the FSQA position. *See* 29 C.F.R. § 1630.9(d); *Zaffino v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:14-CV-1909, 2016 WL 5724187, at *6 (M.D. Tenn. Sept. 30,

2016), aff'd sub nom. *Zaffino v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, 688 Fed. App'x 356 (6th Cir. 2017) ("The law is clear that an individual will no longer be considered a 'qualified individual with a disability' if she rejects a reasonable accommodation."). Further, Tyson was under no obligation to place Plaintiff permanently in light duty work or to create a position for her when one did not exist. *See Williams v. Prospect, Inc.*, No. 3:13-CV-0829, 2015 WL 1543500, at *4 (M.D. Tenn. Apr. 7, 2015). Plaintiff is unable to show that there were any open jobs at Tyson for which she could have performed the essential functions with her restrictions.

To the extent that Plaintiff intends to now argue (in contradiction to her January 15, 2019 email and therapist's treatment summary) that she did not need a shift transfer, her claim still fails. The restrictions on the length of Plaintiff's workdays and work weeks similarly removed an essential function, which rendered her unqualified. Plaintiff's own testimony confirms that the essential functions of her job required her to be present when production was running and to work upwards of 12 hours per day. If Plaintiff cannot meet the time requirements of her job, it follows that she is not qualified individual with a disability.

### 2. Plaintiff's Request for Less Work Is Not a Reasonable Accommodation

Plaintiff's failure to accommodate claim also fails because her requested accommodations were unreasonable. Under the ADA, the plaintiff bears the burden of showing that she proposed an accommodation and that the proposed accommodation was objectively reasonable. *Wyatt*, 2019 WL 6682197, at *12. Plaintiff cannot meet this burden because her accommodation requests were nothing more than requests for less work or, as Plaintiff phrased it, a "work-life balance." (Pl. Dep. at 125:14-22). Plaintiff considered her position extremely stressful and she was burnt out. (*See* Pl. Dep. at 125:14-22, in which she states, "I work and then

I work, and that's it."). A request for less work, however, is not reasonable. In fact, it is well established that a reasonable accommodation does not require lowering standards or removing essential functions of the job. *See Denczak v. Ford Motor Co.,* 407 F. Supp. 2d 880, 886 (N.D. Ohio 2005) (holding that a reasonable accommodation within the ADA does not require lowering standards or removing essential functions of the job.").

In addition, Plaintiff's requested accommodations did not merely modify her job schedule but risked shifting the burden of her job duties to other employees. Plaintiff admits that supervisors are required to be present when production is running and her long hours resulted from her "supervisory duties postproduction." (Pl. Dep. at 40:3-6, 42:6-13). Thus, accommodating Plaintiff's request for a "normalized schedule" would have forced other employees to perform her supervisory duties. (Denton Dep. at 51:16-18; Kuck Dep. at 65:5-11, 73:1-7). It is well settled it the Sixth Circuit, however, that requiring co-workers to perform the essential functions of a plaintiff's job is not a reasonable accommodation. For example, in *Meade v. AT&T,* 657 Fed. Appx. 391, 397 (6th Cir. 2016), the Court held that an employee's request for light duty meant requiring his co-workers to pick up his slack and take on additional work, which the court held was not a reasonable accommodation. Similarly, in *Brown v. Chase Brass & Cooper Co.,* 14 Fed. Appx. 482, 488 (6th Cir. 2001), the Court held that "[t]he ADA does not require an employer . . . to reallocate job duties in a manner that changes the essential functions of a job." *See also Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999) ("Courts have continuously found that employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability.").

To the extent that Plaintiff is arguing that Tyson had a duty to provide her additional medical leave as an accommodation, that argument similarly fails. Medical leave can sometimes constitute a reasonable accommodation under the ADA, but the Sixth Circuit has made clear that when the proposal for leave is an extension of a prior significant period of leave, the plaintiff must have demonstrated a clear prospect for recovery. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017). Plaintiff makes no such showing here.

The facts establish that Plaintiff took three months of leave pursuant to Tyson's Leave of Absence policy. After exhausting her leave, Plaintiff returned with restrictions. It was only after learning that Tyson was unwilling to create a position for her, that Plaintiff asked for additional time off. Her request for more leave, however, did not demonstrate a clear prospect of recovery. The relevant injury is whether the employee showed her employer a certain or credibly proven end to the leave. *See Cooley v. East Tenn. Human Resource Agency, Inc.*, 720 Fed. App'x 734, 741 (6th Cir. 2017) (holding that "for an additional leave of absence to be a reasonable accommodation under the ADA, the employee must, at a minimum, provide the employer with an estimated, credible date when she can resume her essential duties.").

Plaintiff gave Tyson no information to indicate that more leave would enable her to perform the essential functions of her position after returning to work. To the contrary, her treatment summary did not identify a date on which her requested accommodations would end, nor did she discuss with her therapist whether additional leave was even a viable option. *See Maat v. County of Ottawa*, 657 Fed. Appx. 404, 412–13 (6th Cir. 2016) (concluding that where an employee had already received substantial leave, additional leave was not a reasonable accommodation because her physician's vague estimate of a return date was uncertain and indicated that she might need further treatment).

For all of these reasons, Tyson was justified as a matter of law to deny Plaintiff's accommodation requests as unreasonable.

### C. Plaintiff's Failure to Engage in the Interactive Process Claim Fails as a Matter of Law

Plaintiff's claim for failure to engage in the interactive process also fails. The undisputed evidence shows that Tyson did, in fact, engage in an interactive process with Plaintiff. Kuck and Al-Saadawi met with Plaintiff to discuss her restrictions and possible accommodations. Together they reviewed the open positions report and discussed the requirements of each available position. In fact, Plaintiff admits that she was offered an open FSQA position on A Shift but declined it because of the pay. *See Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 871 (6th Cir. 2007) (the purpose of the interactive process is to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations).

Tyson satisfied its obligation to engage in the interactive process. Simply because this meeting resulted in the determination that Tyson was unable to accommodate Plaintiff's restrictions does not mean that Tyson failed to participate in good faith. The law does not require perfection and does not require Tyson to engage in an exhaustive back and forth process with Plaintiff. Further, Tyson was not required to propose counter accommodations in order to participate in the interactive process in good faith. *See Jakubowski v. Christ Hosp., Inc*., 627 F.3d 195, 203 (6th Cir. 2010); *Talley v. Family Dollar Stores of Ohio, Inc*., 542 F.3d 1099, 1108-10 (6th Cir. 2008) (discussing the interactive process but not requiring that the employer make a counter proposal after rejecting the employee's proposed accommodations).

For these reasons, Plaintiff's claim for failure to engage in the interactive process fails as a matter of law and should be dismissed.

### D. Plaintiff's Disability Discrimination Claim Fails as Matter of Law

It appears that Plaintiff also intends to pursue a discriminatory discharge claim under the ADA and TDA. (Doc. 1). Of course, the theories of lability for failure to accommodate and discriminatory discharge are substantially related where, as here, Plaintiff contends that Tyson's failure to accommodate precipitated her termination. Nevertheless, to establish a *prima facie* case of disability discrimination, separate from a failure to accommodate claim, a plaintiff must establish: (1) that she is disabled; (2) that she is otherwise qualified for the position, with or without reasonable accommodation; (3) that she suffered an adverse employment action; (4) that the employer knew or had reason to know of her disability; and (5) her position remained open while defendant sought other applicants or replaced her. *Vasser v. Shiroki N. Am., Inc.*, 2:19-cv-00098, 2020 WL 1905182, at *5 (M.D. Tenn. Apr. 17, 2020).[7] Under the ADA, a plaintiff's disability must be a "but for" cause of the adverse employment action. *Hamric v. City of Murfreesboro,* No. 3:18-cv-01239, 2020 WL 5424104, at *4 (M.D. Tenn. Sept. 10, 2020).

Plaintiff's disability discrimination claim fails because she cannot establish that (1) she is otherwise qualified for her position, with or without reasonable accommodation, and (2) Tyson's legitimate, nondiscriminatory reason for its actions is a pretext for discrimination.

#### 1. Plaintiff is Not a Qualified Individual with A Disability

Plaintiff's disability discrimination claim fails because, as discussed above in Section III(B), Plaintiff is unable to establish that she was a qualified for her position, with or without reasonable accommodation.

---

[7] TDA claims are analyzed under the same principles as those utilized for the ADA. *Id.* Additionally, discriminatory discharge cases based on circumstantial evidence are analyzed under the *McDonnell Douglas* framework. *See Equal Employment Opportunity Comm'n v. Dolgencorp, LLC,* 196 F. Supp. 3d 783, 806–07 (E.D. Tenn. 2016).

## 2. Tyson's Legitimate, Non-Discriminatory Reasons Are Not Pretextual

Even if the Court were to find that Plaintiff has established a *prima face* case of disability discrimination, her claim would still fail because Tyson has articulated a legitimate, non-discriminatory reason for her termination: Plaintiff was unable to return to work and she had exhausted her available leave. *See Mullet v. Wayne Dalton Corp*, 338 F. Supp. 2d 806, 817 (N.D. Ohio 2004) (holding termination of employee who is unable to return to work and has exhausted available leave under employer's policy is a legitimate, nondiscriminatory reason for termination).

Plaintiff cannot show that this articulated reason was a pretext for discrimination. To raise a genuine issue of material fact as to the validity of an employer's proffered reason, a plaintiff must show that it (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate the adverse action. *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1083 (6th Cir. 1994). A plaintiff "must produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendants intentionally discriminated against him." *Parker v. Zale Corp*., 864 F. Supp. 2d 670, 681 (E.D. Tenn. 2012) (citing *Braithwaite v. Timken*, 258 F.3d 488, 493 (6th Cir. 2001)). The burden of persuasion remains at all times with the plaintiff. *Id.* (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Plaintiff cannot meet this burden. Tyson anticipates that Plaintiff will argue that there is evidence of pretext based on her belief that her leave of absence was approved until February 4, 2019. The letter purporting to approve her leave of absence until February 4, 2019 was generated by mistake at Tyson's corporate office. Regardless, Plaintiff admits that she understood she was entitled to three months leave under Tyson's Leave of Absence policy.

Plaintiff exhausted her available leave by January 15, 2019, and Kuck informed Plaintiff of this fact during their meeting on January 18, 2019.  As a result, Tyson moved forward with her termination after she was unable to return to work and declined to accept the open FSQA position.  Plaintiff is unable to establish that she was terminated because Tyson intentionally discriminated against her due to a disability.

### E.  Plaintiff's ADA Retaliation Claim Fails as Matter of Law

Plaintiff also argues that Tyson retaliated against her for requesting an accommodation. (Doc. 1).  There is no direct evidence of retaliatory animus in the record, therefore Plaintiff must try to prove her retaliation claim indirectly.   To establish a *prima facie* case of retaliation, a plaintiff must show evidence that: (1) she engaged in protected activity; (2) her engagement in that protected activity was known to her employer; (3) her employer, thereafter, took an adverse employment action against her; and (4) a causal link exists between her engagement in the protected activity and the adverse employment action.  *Weems v. Metro. Gov't of Nashville and Davidson Cty.*, No. 3:17-cv-01072, 2018 WL 6341826, at * 8 (M.D. Tenn. Dec. 4, 2018). Ultimately, a plaintiff must show "but-for" causation. *Id.* (citations omitted)).   Plaintiff's retaliation claim fails because (1) she cannot repackage her failure to accommodate claim as a retaliation claim, and (2) Plaintiff is unable to establish that Tyson's legitimate, nonretaliatory reason for its actions was a pretext for retaliation.

#### 1.  Plaintiff's Retaliation Claim is an Attempt to Repackage Her Failure to Accommodate Claim and Should Be Dismissed

Plaintiff argues that she was terminated in retaliation for requesting an accommodation. (Doc. 1, ¶ 35).  However, the alleged retaliatory act (i.e. Plaintiff's termination) occurred due to Tyson's inability to accommodate her restrictions. Thus, Plaintiff's retaliation claim is

effectively a repackaging of her failure to accommodate claim and it should be dismissed consistent with this Court's holding in *Wyatt,* 2019 WL 6682197, at *16.

In *Wyatt*, this Court found that a failure to accommodate cannot constitute retaliation for an employee's request for accommodation. *Id.* As this Court explained, requesting an accommodation inevitably carries the possibility that the employer will reject the request. *Id.* As a result, if the alleged retaliatory acts constitute nothing more than the way in which the defendant rejected Plaintiff's accommodation requests, those requested accommodations cannot serve as the basis of a retaliation claim. *Id.*

Although the alleged retaliatory act in this case is termination, the rationale in *Wyatt* is applicable because the termination is inextricably linked to Tyson's inability to accommodate Plaintiff's restrictions. Therefore, Plaintiff's retaliation claim is a mere repackaging of her failure to accommodate claim and should be dismissed. *See also Pinto v. New York City Adm. for Children's Servs.*, No. 18-cv-1852, 2018 WL 4333990, at * 11 (S.D.N.Y. Sept. 11, 2018) (although requesting a reasonable accommodation under the ADA is a protected activity, any activity comprising a plaintiff's failure-to-accommodate claim cannot also constitute protected activity such as that required to form the basis of a retaliation claim).

### 2. Tyson's Legitimate, Non-Retaliatory Reasons Are Not Pretextual

Even if the Court were to find the holding in *Wyatt* inapplicable, Plaintiff's retaliation claim would still fail because Tyson had a legitimate, non-retaliatory reason for her termination that is not pretextual. Tyson's arguments on this point are discussed above in Section III(D)(2).

### F. Plaintiff's TDA Retaliation Claim Fails as Matter of Law

### 1. Plaintiff Has Not Pleaded a TDA Retaliation Claim

To the extent that Plaintiff intends to pursue a TDA retaliation claim, it also fails. As an

initial matter, the only reference to retaliation in violation of the TDA is found in the heading of Count II. (Doc. 1, p. 6). But Plaintiff makes no factual allegations to support this claim. *Id.* Plaintiff, therefore, has not properly pleaded a TDA retaliation claim and it should be dismissed. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).

### 2. Even it Pleaded, Plaintiff's TDA Claim Fails as Matter of Law

Even if properly pleaded, Plaintiff's TDA retaliation claim fails as a matter of law. The underlying basis for Plaintiff's retaliation claim is her request for an accommodation. But requesting an accommodation is not protected activity under the TDA and cannot support a retaliation claim. *See Lovell v. Champion Car Wash, LLC*, 969 F. Supp. 2d 945, 954 n.8 (M.D. Tenn. 2013) ("Requesting a reasonable accommodation under the TDA is not a protected activity, and does not support a retaliation claim."); *Burress v. City of Franklin*, 809 F. Supp. 2d 795, 818 (M.D. Tenn. 2011) (finding that "because the plaintiff's TDA retaliation claim is premised entirely upon his having requested a reasonable accommodation, it appears the claim must fail. As Tennessee law does not require employers to make a reasonable accommodation, it follows that requesting an accommodation is not protected activity.").

For these reasons, Plaintiff's TDA retaliation claim fails as a matter of law and should be dismissed.

### IV. CONCLUSION

For the reasons presented herein, Tyson submits that there is no genuine issue as to any material fact and it is entitled to a judgment as a matter of law on all of Plaintiff's claims. Tyson therefore requests that the Court grant its Motion for Summary Judgment and enter an Order dismissing Plaintiff's claims with prejudice.

Respectfully submitted,

s/ Kenneth A. Weber
Kenneth A. Weber, BPR No. 015730
Megan M. Sutton, BPR No. 029419
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
Baker Donelson Center
211 Commerce Street, Suite 800
Nashville, Tennessee 37201
Telephone: (615) 726-5600
Facsimile: (615) 726-0464
kweber@bakerdonelson.com
msutton@bakerdonelson.com

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2020, a copy of the foregoing Memorandum of Law in Support of Defendant's Motion for Summary Judgment was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

Heather Moore Collins BPR # 026099
Anne Hunter BPR # 022407
Collins & Hunter PLLC
7000 Executive Center Drive, Suite 320
Brentwood, TN 37027

s/ Kenneth A. Weber
Kenneth A. Weber