# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

**JACQUELYN VEITH,**

                **Plaintiff,**                **Case No. 3:19-cv-01065**

**v.**                                   **Judge Richardson**
                                           **Magistrate Judge Holmes**

**TYSON FRESH MEATS, INC.,**

               **Defendant.**            **JURY DEMAND**

_____/

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Only by ignoring unfavorable testimony and evidence, late produced evidence, and prevailing Sixth Circuit law does Tyson bring this motion with respect to Veith's ADA claims. Here, Ms. Veith was diagnosed with two disabling conditions that put her out of work for three months while she received specialized treatment and medication management. Knowing this, Tyson granted her extended medical leave and short-term disability to February 4, 2019 through its in-house disability insurance program. In advance of her expected return to work in February, Ms. Veith presented recommended accommodations on January 15, 2019 from her medical provider. Rather than engaging in a true interactive conversation, Tyson drew its own conclusions based on the recommendations, pulled "open" positions they admitted were not viable, *e.g.* a language interpreter, and predetermined she was not qualified for accommodation. It failed to actually have a two-sided discussion with her as required by the ADA and terminated her based on an erroneous analysis of her medical recommendations and her job duties, which she could have performed with accommodation. Tyson's HR Manager, Kuck ignored that Tyson had already approved Veith's medical leave through February 4 and refused to allow her to go back to her

medical provider to discuss alternatives. In doing so, Tyson violated the ADA. When not ignoring material facts and drawing all inferences and credibility determinations in Veith's favor, Tyson's motion for summary judgment must be denied with respect to the ADA claims; Plaintiff stipulates to voluntary dismissal of the TDA and FMLA claims.

## I.    FACTUAL BACKGROUND

**Veith's Employment History with Tyson and her Job Duties**

Veith began working for Tyson February 12, 2018 as a production manager in the beef slice department on B-shift. (Veith Dep. 29). At the time, B-shift ran from 2:00pm until the about 2:00am for Veith, five days a week, and her shift supervisor told Veith she would work five days a week with an occasional sixth day. (Veith Dep. 30, 36, 41).

Veith's job duties included ensuring all team members followed food-handling procedures, employee safety, following ergonomic standards, scheduling, producing food to specifications, reporting potential issues, checking in with employees on her line, preparing reports and occasionally working the line. (Veith Dep. 31-32, 40, 44-45, Veith Dep. Ex. 2 p. 000140). In her first three months, Veith worked seventy to eighty hours a week and six days a week, unless the line did not run on Saturday. (Veith Dep. 31, 130). Tyson does not advertise a six-day workweek nor list it as an essential function of the job. (Kuck Dep. 42-44, 60; Veith Dep. Ex. 2 p. 000140).

Supervisors were typically responsible for one to three lines, but after a few months, Veith was responsible for a total of four out of nine lines in the beef slice department and she supervised five team leads and five supervisors. (Veith Dep. 32-33; Kuck Dep. 57). Veith was the only employee supervising more than one line. (Veith Dep. 34). Line leads, floater supervisors or "back-up generals" could cover for the supervisors when they were out for any reason, including doctor's appointments, vacation, pregnancy, or personal reasons; for example, one supervisor has a

2

religious engagement every Thursday. (Veith Dep. 43, 166; Al-Saadawi Dep. 14; Kuck Dep. 50). Another supervisor would be assigned that line, even though the lead would be running it. (Veith Dep 43, 166; Kuck Dep. 56). Veith was a team player and tried to help fellow supervisors because supervisors were expected to work together as there were multiple supervisors on each shift to work together affected everyone's yields. (Veith Dep. 52; Kuck Dep. 56).

**Tyson Leave of Absence ("LOA"), ADA, and Short Term-Disability ("STD") Policies**

**LOA Policy**: Employees employed for three months to one year were allowed three months leave. (Veith Dep. 72; Kuck Dep. 16; Luckett Dep. Ex. 7 p. 0135-136). The maximum amount of leave time could not be exceeded *unless* approved by the Vice President, HR Operations, the HR Director, or as required by law. (Kuck Dep. 15-16,18; Luckett Dep. 32, Ex. 7 p. 0136). Employees returning from a LOA must provide a "Return to Work Certification from their health provider indicating that they are able to resume work, with or without reasonable accommodation." (Luckett Dep. Ex. 7 p. 000138).

In 2019, Ms. Lisa Luckett, managed LOAs and FMLA. (Kuck Dep. 10-11; Luckett Dep. 7). Luckett placed all team members on leave, entered their LOA dates, but corporate managed salaried employees' STD. (Luckett Dep. 11, 35). Kuck and the Nurse Manager, Pam Blaker, could look at this system and the LOA spreadsheet. (Kuck Dep. 13; Luckett Dep. 12). Two months after Veith's termination, Tyson made the decision to have a third party administer its leave process. (Kuck Dep. 13).

Employees needing medical leave sent documentation to health services ("OHS") who filled out a job activity notification and provided a copy to the employee's supervisor and HR. (Kuck Dep. 24; Luckett Dep. Ex 24 p. 000105-107). Blaker reviewed all doctor's notes, synthesized the information, sent it to HR, and made notes regarding employee's leave. (Kuck

Dep. 66; Blaker Dep. 12, Ex. 34 p. 000088). OHS would send Luckett the job activity notification including the leave dates, she would log this, along with the date the employee was expected to return to work, and send it weekly to managers. (Luckett Dep. 13, 15; Al-Saadawi Dep. 11)

Luckett would also enter the information into the corporate database and corporate would send the approval letter to the salaried employee, under HR Director Kuck's name. (Luckett Dep. 13-15, Ex. 15, 32 at p. 150; Kuck Dep. 21; Veith Ex. 13, 14). Employees would know their leave was approved when they received this letter with their report to work date. (Luckett Dep. 13-15; Kuck Dep. 21). However, contrary to the language, "your approved LOA will expire on," Denton, Director of HR Operations, claimed this was not an "approval letter," but only notified the employee their paperwork was received, accepted, and updated. (Denton Dep. 45; Luckett Dep. Ex. 15 p. 000140). Despite this "black and white" language, and no policy to the contrary, according to Denton, the employee should contact HR if they believe they have exhausted their leave, even though the letter contained no mention of exhausted leave, and only a generic statement that if the employee has questions to contact HR. (Denton Dep. 47; Luckett Dep. Ex. 15 p. 000140). Luckett testified that she had never contacted an employee regarding their remaining leave. (Luckett Dep. 14). Luckett understood that the leave letters mean what they say, that an employee has until a certain date to return. (Luckett Dep. 19).

Copies of LOA approval letters with Kuck's name in the signature were emailed to Kuck and Luckett, who would place a copy in the employee's file. (Kuck Dep. 21-22). Luckett would also bring Kuck a stack of LOA forms to sign including the employee's name, dates of leave, and the type of leave the were on. (Kuck Dep. 20; Luckett Dep. Ex. 28 p. 0031).

**Short Term Disability ("STD") Policy:** After an employee has been absent from work for a period of five consecutive scheduled workdays or forty consecutive work hours, whichever

occurs first and has been approved for a medical LOA, the team member is eligible for STD compensation. (Luckett Dep. Ex. 33 p. 000155-156). If a subsequent disability recurs more than thirty days after the end of a prior disability the employee is entitled to a new maximum payment period. (Id. p. 0156). Per Tyson's case management process, "STD benefits will be payable following review and approval through the STD process. The review process is handled in-house utilizing national occupational disability guidelines." (MSJ Ex. 1 Salaried and Management Non-Exempt Short Term Disability Case Management Process, Tyson 599). "Team members are eligible for up to three (3) months of STD benefits" and are then evaluated for Long Term Disability or light duty, if necessary. (Id.).

**ADA Accommodation and EEO Policy**: If an employee presents restrictions or accommodations, Tyson is supposed to enter into the interactive process <u>under the assumption the employee has a qualified disability under the ADA</u>, consistent with its policy and law. (Kuck Dep. 47, Ex. 31 p. 000379 (emphasis added). *See* Veith Dep. Ex. 5 p. 000128-129). Each request should be "promptly addressed on a case-by-case basis by authorized HR and medical professionals." (Kuck Dep. Ex. 31 p. 000379). After an employee provides OHS with medical documentation, the nurse contacts the HR Manager who engages in the interactive process. (Denton Dep. 16-17, 19-20; Jal Dep. 9; Kuck Dep. Ex. 31 p. 000379).

Corporate engagement usually takes place after the plant HR manager engages with the employee. (Denton Dep. 18). The local plant does not have the authority to deny accommodation without engaging Denton, and other support team such as legal. (Denton Dep. 21). In fact, "[a]t no time will a final decision to deny a requested ***reasonable accommodation*** be made *without exhausting the interactive* and collaborative process with the respective location HR, Occupational Health/Nursing Department, Director of HR Operations, the Employment Compliance

Department, and the Legal Department, as circumstances dictate." (Kuck Dep. Ex. 31 p. 000380) (emphasis added). If the plant was uncertain of the accommodation, they should engage Denton to explore all options and only if they were at a dead-end would they engage other corporate entities such as legal, despite policy stating should the authorized HR personnel "determine[] the location cannot grant an accommodation and after consultation with OHS and the Director of HR Operations, the Employment Compliance Department will be notified and will initiate a collaborative review process with the location HR, OHS, Director of HR Operations, and Legal Department." (Denton Dep. 17, 18; Kuck Dep. Ex. 31 p. 000380). Tyson acknowledges that an extension of medical leave is an accommodation under the ADA as well as job restrictions. (Kuck Dep. 107). Moreover, Tyson has "light-duty positions" for employees if needed. (Kuck Dep. 74).

**Veith Has a Disability Defined by the ADA**

In the fall of 2018, after Kim Jal became Veith's supervisor, she felt that her fellow supervisors began harassing her and was experiencing a hostile work environment. (Veith Dep. 34-36, 46, 50-51; Jal Dep. 6). Jal came from A-shift, not understanding the demands of B-shift, refused to listen to Veith and told her to run meat on the wrong line.[1] (Veith Dep. 55, 69-70). Jal's disregard and friction with co-workers caused Veith's anxiety to increase. (Id. 59).

Experiencing Jal's dismissiveness, and the hostile environment she perceived, Veith sought medical help. (Veith Dep. 68, 96-97, 128, 155). Veith met with counselor, Bethanie Hiramoto, on November 11, 2018, reporting dramatic changes in mood and anger caused work issues and stress. (Hiramoto Dep. 20-21, 23, Ex. 2 p. 000003). Hiramoto initially diagnosed Veith unspecified Anxiety Disorder. (Hiramoto Dep. 26, Ex. 2 p. 000004, Ex. 5). The same day, Veith emailed Tyson a letter from the Ross Center that she would be out of work from November 12 until November

---

[1] He told Veith to run a high-grade product line, usually run by the A-shift, which required Veith and her team to break down the machine and clean it to meet guidelines before running the high-grade meat. (Veith Dep. 55-56)

19 and was under the care of a professional seeking care until further notice. (Veith Dep. 79, Ex. 9 p.00098, 00114; Hiramoto Dep. 31, Ex. 3 p. 000114). Hiramoto took Veith off work due to the intensity of her symptoms, as functioning at work was not going to be possible. (Hiramoto Dep. 32, Ex. 5 p. 00145). Veith confirmed with Blaker that the paperwork was correct. (Veith Dep. 80, Ex. 10). HR, OHS, and Veith's supervisors were updated on her medical LOA. (Luckett Dep. 22, 24, Ex. 24, Ex. 32 p. 0165; Jal Dep. 9; Al-Saadawi Dep. 9; Kuck Dep. 19-20).

On November 18, Veith applied for an extension to December 11 and notified Blaker, Luckett, Kuck, Cooper, and Jal. (Veith Dep. 81, Ex. 10 p. 000093, 000112; Kuck Dep. 24). At this time, Hiramoto diagnosed Veith with "Unspecified Bipolar and Related Disorder" in addition to her "Unspecified Anxiety Disorder." (Hiramoto Dep. 38, 40, Ex. 2 p. 000007, Ex. 5). Luckett sent Veith the required short-term disability ("STD") paperwork, and Hiramoto subsequently provided Tyson more details to support the STD leave, and in return, Tyson approved her STD. (Veith Dep. 82-83; Luckett Dep. Ex. 32 p. 150). When she applied for STD, on November 23, 2018, Tyson was subsequently made aware the stress and anxiety affected Veith's ability to sleep, eat, concentrate, breathe, focus, and think, her diagnoses, and extended her leave until December 11. (Veith Dep. 84, 211-212; MSJ Ex. 2, 11/23/19 Email- STD Application, Tyson 594-598; Hiramoto Dep. 45, Ex. 5 p. 0145-149). Luckett again updated Tyson's records and sent a letter under Kuck's signature that "your approved LOA will expire on 12/11/2018." (Veith Dep. Ex. 14 p.028).

On December 9, Veith emailed Luckett, Kuck, Cooper, and Jal another note from Ross Center extending her leave, reiterating she was under Hiramoto's continued care and requested her leave be extended until January 7, 2019. (Veith Dep. 85, Ex. 11 p. 000143, 000110; Kuck Dep. 24; Hiramoto Dep. 52, Ex. 6 p. 000110). Luckett again updated corporate records sent a letter stating, "your approved LOA will expire on 01/07/2019." (Veith Dep. Ex. 14 p. 000029; Luckett

Dep. Ex. 32 p. 000149). Around December 9, Veith and Hiramoto discussed her seeking additional, more specialized treatment with another therapist for Eye Movement Desensitization and Reprocessing ("EMDR"). (Hiramoto Dep. 50; Ex. 2 p. 000009). Veith began EMDR treatment on December 11 and continued until June 27, 2019, when her therapist left the Ross Center and Veith was unable to afford out of pocket treatment. (Hiramoto Dep. Ex. 2 p. 000010-11, 14-15, 20-21, 24-25, 28-29, 32-37, 40-43, 46-73; Veith Dep. 159-160).

On January 10, Veith emailed another note from Hiramoto stating she was to remain out of work until February 4, her health plan had been updated, and she was continuing outpatient treatment. (Veith Dep. 86, Ex 12 p. 000108; Hiramoto Dep. 63, Ex. 7 p. 000108). Blaker and Luckett again completed the required corporate documentation. (Blaker Dep. 17, 24-25, Ex. 17 p. 000091-92; Kuck Dep. Ex. 22 p. 000003; Luckett Dep. Ex. 24 p. 000107). Veith received another letter, dated January 15, 2019, under Kuck's signature, stating, "your approved LOA will expire on 02/04/2019." (Veith Dep. Ex. 13 p. 000140; Luckett Dep. Ex. 24 p. 000107, Ex. 32 p. 000150). Kuck and Luckett were notified of the LOA letter and expected to return to work date. (MSJ Ex. 3 1/15/19 Email Shepard to Luckett, Kuck, Tyson 636; MSJ Ex. 4 1/17/19 Email Luckett [Luckett] to Joyce Brannan, Tyson 623).[2] Kuck, Veith's shift supervisor, and Luckett later signed her LOA forms. (Luckett Dep. 20-21, Ex. 28; Kuck Dep. 99).

Per policy, on January 15, Veith emailed Kuck, Blaker, and Cooper her return to work treatment summary, information regarding her disability, and recommendations for accommodations requests. (Veith Dep. 92; Kuck Dep. 23, 62, 64, Ex. 22 p. 000003; Blaker Dep. Ex. 17 p. 000105-106; Luckett Dep. Ex. 15 p. 000140). Hiramoto recommended "a normalized

---

[2] Tyson never disclosed Ms. Brannan as a witness, and this email was not produced by Tyson until after the close of discovery, well after all depositions had taken place, on November 16, 2020, when it produced approximately 100 pages of relevant, many of which are unfavorable to Tyson. (Tyson 591-690). Likewise, Tyson did not reference Blaker or, Luckett's testimony in its motion.

schedule (ex. A-shift), keep working days to five days a week max, and be able to attend therapy and medication management appointments;" these were examples of accommodations, not all were required. (Veith Dep. 93, 99, Ex. 21; Luckett Dep. Ex. 24 p. 000106, Hiramoto Dep.73, 100-101, Ex. 8 p. 0000106). A "normalized schedule" meant a routine schedule allowing Veith to know her days off, even if they were on a rotation and an occasional sixth day and to be able to attend appointments; but it did not require a Monday through Friday schedule. (Veith Dep. 126, 167; Kuck Dep. 4; Luckett Dep. Ex. 24 p. 000106; Hiramoto Dep. 72). The letter also stated Veith was in therapy for stress, emotional control, and overwhelming thoughts and discussed her anxieties, medication management and her continued treatment. (Veith Dep. 93; Luckett Dep. Ex. 24 p. 000106; Hiramoto Dep. 65, Ex. 8 p. 000106). Hiramoto did not include Veith's specific diagnoses as it is not standard to do so. (Hiramoto Dep. 65, 69).

Blaker summarized Hiramoto's recommendations and informed Kuck, "*I believe to maintain a regular work schedule can be accommodated reasonably at a 5 day week on her normal schedule and keeping that schedule assures her compliance with all appointments*." (Blaker Dep. 17, Ex. 34 p. 000088; Al-Saadawi Dep. 25; Kuck Dep. 64, Ex. 22 p. 000003(emphasis added)). Based on her experience as a nurse manager and thirty years with Tyson, Blaker believed a five-day workweek could be accommodated on the basis that Veith was already on B-shift and "normalized schedule" meant Veith's routine schedule, which would allow her to go to morning counseling appointments. (Blaker Dep. 19, Ex. 22).

**Tyson Fails to Follow its ADA Policy**

After Kuck received Veith's accommodation request, Veith was contacted while she was still on leave to schedule a meeting. (Veith Dep. 100, 163; Kuck Dep. 78; MSJ Ex. 5, 1/18/19 Email Cooper to Kuck, Blaker, Al-Saadawi, Lorenzo, Tyson 626). Kuck read her accommodation

9

recommendations as required restrictions and did not contact Hiromoto for clarification, even though the email invited him to do so. (Kuck Dep. 39-40, Ex. 22 p. 000003). While Kuck testified he did not read the entire letter and skipped past the diagnosis portion of the doctor's note, he was aware she was taking medications and believed, despite the letter stating, "Limitations of the treatment: None,' he concluded "[t]here's some limit to the treatment. There's something that the treatment couldn't accomplish." (Kuck Dep. 45, 48).

Prior to Veith's meeting, Kuck discussed her request for accommodations with Blaker regarding the medical necessity of Veith's accommodations and Gary Denton, Director of HR Operations. (Kuck Dep. 25, 103; Denton Dep. 7-8, 23). Kuck collaborated with Denton, the legal department, and other HR personnel *prior* to his meeting with Veith and made the forgone conclusion that she could not be accommodated based on their restrictive reading of the recommendations. (Kuck Dep. 108-109; Denton Dep. 21, 23, 49). In doing so, Kuck spoke with Denton and Al-Saadawi about the available job positions, the five-day week recommendation, Veith's exhaustion of leave (even though it was not), and Luckett's extension of Veith's LOA. (Kuck Dep. 26-27, 43, Ex. 25). Kuck determined she exhausted her leave based on the "leave calendar," but claims he never spoke to Luckett regarding the extension of Veith's leave. (Kuck Dep. 13, 28-29, 63). Mr. Kuck later testified that Tyson's approval and extension were clerical errors that should not have been entered, though Luckett was not reprimanded for the "mis-keying," and was never spoken to about Veith's LOA return date or any allegation it was mis-entered or mis-keyed. (Kuck Dep. 77; Luckett Dep. 29). Subsequent emails support that Veith's leave was indeed extended to February 2019, because Brannan, Tyson Corporate Benefits Coordinator, questioned why Veith was terminated for "not coming to work" when she had an extension in place. (MSJ Ex. 6, 1/24/19 Email Brannan to Luckett, Tyson 662).

Tyson never told Veith her leave was exhausted, and Denton testified he was not aware if it had been communicated to her. (Kuck Dep. 29; Denton Dep. 45). Kuck did not consider Veith's February 4 extension approval letter. (Kuck Dep. 83). Kuck did not go over Tyson's ADA policy, the essential and non-essential functions of her position or the requirements of her job description, which did not include a six to seven-day workweek, with Veith during this meeting. (Kuck Dep. 61, 86, 107). Veith's supervisor, Jal, was not consulted regarding Veith's job duties in the context of reasonably accommodating her, nor was Blaker. (Jal Dep. 10; Blaker Dep. 20,22).

**Tyson Fails to Engage in the Interactive Process in Good Faith and Accommodate Veith Despite Her Attempts to Find Solutions**

On January 18, 2019, Veith met with Kuck and Al-Saadawi for approximately thirty minutes to one hour to discuss the accommodation recommendation and return to work. (Veith Dep. 101, 103; Kuck Dep. 71; Al-Saadawi Dep. 8). Despite Veith's supervisory position, Kuck and Al-Saadawi discussed exclusively hourly positions with Veith and never reviewed her job description when discussing her accommodation requests. (Veith Dep. 103; Kuck Dep. 72, 83). Kuck admitted that none of the positions that were offered to Veith were really an option because she did not speak the languages for the interpreter position, the manifester position was not even open (it had already been filled), and the FSQA position was half the pay and still more than five days a week. (Kuck Dep. 96). She could not accept these position as one would exacerbate an issue with her hand and while she would have considered a demotion to a lead position, these positions would reduce her position to an entry-level. (Veith Dep. 111; Kuck Dep. 72, Ex. 25 p. 000001). Other positions were available including a floater position or temp supervisor position while others were on leave, however, the more Veith attempted to discuss options with them the more determined they became about her termination and would just state her position is a six to seven day position. (Veith Dep. 106, 112, 216; Kuck Dep. 54). Veith suggested a temp supervisor option

as her accommodations were never listed as permanent restrictions. (Veith Dep. 112, 216). Veith offered to remain on B-shift but Denton claimed, "that's not what we were there to discuss," and would only consider Veith's *example* of a normalized schedule involving A-shift. (Veith Dep. 99, 137; Denton Dep. 25, 29-30, 35-36). Kuck considered A-shift an absolute restriction and admitted B-shift was never considered. (Kuck Dep. 96; Al-Saadawi Dep. 31). Tyson refused to consider its ability to accommodate a five-day workweek, and Kuck never discussed with Veith a phased return starting with five days and adding a sixth and no one spoke to Jal, her supervisor, whether Veith could come back and perform her duties in a five-day workweek. (Kuck Dep. 110, Ex. 25 p. 000001; Jal Dep. 9). Al-Saadawi would only tell Veith this is a six-day per week job, however Veith stated that A-shift is a swing shift and managers are guaranteed two days off a week; everyone was off Sunday and would rotate another day off during the week, this was both practice and policy. (Veith Dep. 106, 108, 169). However, B-shift was supposed to have this swing shift option but was not allowed to exercise it. (Veith Dep. 107).

Veith additionally asked about other supervisors covering for her for one day per week, but Kuck determined this was unfair to other supervisors, despite Veith's LOA never affecting other supervisor's ability to take time off. (Kuck Dep. 73, Al-Saadawi Dep. 18). Kuck did not take into consideration the financial resources of the facility when considering the five-day workweek accommodation, nor the number of supervisors at the facility where Veith worked. (Kuck Dep. 115). Kuck could not say whether allowing other employees to fill in Veith's duties would have an impact on the facility's ability to conduct business. (Kuck Dep. 116).

Veith also spoke to Veith about her injury being a "non-occupational injury or illness" and that a non-occupational injury is different than an occupational injury as policy allows for an altered position to return the employee to work. (Kuck Dep. 74). Kuck testified that had Veith

experienced an occupational injury she would have been put on light-duty, and a schedule could be reduced. However because she had a non-occupational illness, she was ineligible, which is inconsistent with Tyson's STD process. (Kuck Dep. 75, 114; MSJ Ex. 1- Salaried and Management Non-Exempt Short Term Disability Case Management Process, Tyson 599). Further, Kuck claimed that no positions fit Veith's restrictions because none of the positions allowed for a five-day workweek. (Kuck Dep. 93, Ex. 25 p. 000001-2).

Veith could have performed her own position with accommodation, had she been given the opportunity to stay on leave until February 4, as approved, and she could have spoken with her therapist to confirm B-shift was acceptable. (Veith Dep. 120, 136). Veith begged to go back and speak with her therapist to see if she could change the accommodations requests, based on what was available and obtain clarification regarding her ability to work B-shift. (Veith Dep. 103, 121, 216; Kuck Dep. 87, Ex. 25 p. 000002). Kuck refused without consideration and instead stated, "If you can't come back to work today, we're going to terminate you." (Veith Dep. 104, 122, 168; Kuck Dep. 62, 83, 95). Denton stubbornly justified this lack of consideration:

> "[Veith] had worked B-shift for several months. So it was no mystery that she was already on a B-shift position. So, I would think that as a professional manager, you would have that conversation with your health care provider . . . before you come in and demand an A-shift position."

(Denton Dep. 37). Further, he considered that "this [her 1/8/19 note] was her request through her doctor and through her own words." (Denton Dep. 39).

Veith did not understand why Kuck was claiming for the first time, that her leave was exhausted when her approval letter stated leave was approved through February 4. (Veith Dep. 104; Kuck Dep. 73). Veith asked Kuck and Al-Saadawi for a little more time to adjust her medications from morning to evening medications as they caused issues with her ability to sleep, to no later than February 4, but was immediately denied her request to come back to B-shift. (Veith

Dep. 151-152; Kuck Dep. 62; Al-Saadawi Dep. 32). Kuck never considered whether supervisors who were covering her lines could continue to do so until February 4. (Kuck Dep. 57-58, Ex. 25 p. 02). Kuck simply informed Veith she was fired. (Veith Dep. 115; Kuck Dep. 73).

Kuck did not speak with Denton after the meeting, under the belief "[she] did not offer up any type of ideas that she had, or she was not engaging in the interactive process around what we could do to reasonably accommodate her." (Denton Dep. 23). Despite this, Denton approved her termination on January 21. (Kuck Dep. 102, Ex. 29 p. 000084-85; Denton Dep. 48, 51). Denton relied exclusively on what Kuck recounted of the meeting and the notes, which Kuck began preparing prior to the meeting, and sent to Denton after already terminating Veith.[3] (Denton Dep. 26-27; Kuck Ex. 25 p. 000001-2). Kuck filled out Veith's termination information the same day he had the pre-determined "interactive conversation" and reported it was involuntary and that she "failed to report to work." (Kuck Dep. 95, 100, Ex. 29)

**Tyson Had a Rotational Schedule in Place and a Sixth and Seventh Day Pay Policy That Demonstrates Veith's Request For a Normalized Schedule was Reasonable**

While Veith was discussing her requests for accommodation with Kuck, both shifts had or were in the process of adopting a "floating rotation schedule," and were trying to give an additional day off during the production week. (Kuck Dep. 83; Jal Dep. Ex. 27 p. 00016). Early in 2019, Tyson implemented a policy that if an employee works a sixth day, they can either take a pay day or take an additional day off. (Kuck Dep. 84, 98; Jal Dep. 10; Al-Saadawi Dep. 18, 23; MSJ Ex. 7, Sixth and Seventh Day Pay Salaried Production Policy, Tyson 579-580). This rotational schedule allows employees to sign up for the six months at a time to only work five days per week, allowing for employees who must work a Saturday to take another day off during the week. (Jal

---

[3] Kuck took handwritten notes but testified he *shredded* these notes after he re-wrote a "cleaned up" version of them. (Kuck Dep. 67, Ex. 22 p. 000003)

Dep. 10, 14; Al-Saadawi Dep. 21). Employees fill out a document five weeks in advance and share with the supervisors; most opt to have their rotational day off, *i.e.*, work a five-day workweek rather than receive "6th day pay." (Jal Dep. 12; MSJ Ex. 8, 2/26/19 Selection Forms, Tyson 581-589). Al-Saadawi testified, that while it may have been difficult to accommodate a five-day workweek for Veith, with the rotation schedule they may have been able to do it, however this was never discussed. (Al-Saadawi Dep. 26). Moreover, not only was this policy finalized in September 2018, and selections made on February 26, 2019, but rotational schedules for management were already in place in late 2018 and Veith specifically raised the issue with her managers regarding its implementation. (Jal Dep. Ex. 27; MSJ Ex. 9 8/11/18 Email Veith to Griffin, fwd'd to Kuck, Tyson 652-653; MSJ Ex. 10, 10/29/18 Email Griffin to Kuck, Tyson 677-678). Kuck insisted Veith had to work a 6- to 7- day schedule; "bottom line is that [Veith] had to work more than five days," even though the rotational schedule belied that contention which he clearly had knowledge of in the fall of 2018. (*Id.*, Kuck Dep. 54, 41-44, MSJ Ex. 10, 10/29/18 Email Griffin to Kuck, Tyson 677-678).

## II.    SUMMARY JUDGMENT STANDARD

The court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party on a Rule 56 motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The court's function is not to determine the truth of the matters asserted, but whether there is a genuine issue of fact for trial. *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000). Summary judgment should not be imposed to deny a party an opportunity to present a meritorious claim or defense on his/her "day in court." *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979). In determining whether the moving party has met its burden, the [t]he evidence of the nonmovant is to be believed and

court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

### III. ARGUMENT

#### A. Tyson Violated the ADA

The ADA was enacted in response to congressional findings highlighting "the continuing existence of unfair and unnecessary discrimination and prejudice [that] denies people with disabilities the opportunity to compete on an equal basis." 42 U.S.C. § 12101(a)(8). When the Act was amended in 2008, "Congress reasserted its goal of 'provid[ing] clear, strong, consistent, enforceable standards' to implement a 'comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 849 (6th Cir. 2018) (alteration in original) (quoting 42 U.S.C. § 12101(b)(1), (2)).

"ADA discrimination claims are analyzed under two different rubrics, depending on whether the plaintiff relies on 'direct' or 'indirect' evidence of discrimination." *Morrissey v. Laurel Health Care Co.*, 943 F.3d 1032, 1037 (6th Cir. 2019). "Claims premised on an employer's failure to offer reasonable accommodation necessarily involve direct evidence and the burden shifting approach is not applicable." [4] *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (applying the direct evidence standard for a failure to accommodate claim). Thus, where a case of ADA discrimination is premised on an allegation that an employer failed to accommodate or whether an employee was a qualified individual with a disability the three-factor direct evidence approach is appropriate. *Hostettler v. City of Wooster*, 895 F.3d at 853.

---

[4] "Direct evidence is evidence that proves the existence of a fact without requiring any inferences" *i.e.* pretext. *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (citations omitted).

Tyson contends, but is unable to demonstrate a reasonable jury could not determine: 1) Veith is a qualified individual with a disability; 2) Tyson failed to engage in the interactive process in good faith and to reasonably accommodate Veith; 3) Tyson's reason for termination was pretextual; and 4) Tyson retaliated against Veith after she requested an accommodation. (ECF 24, MSJ p. 1-2).

### 1. ADA Discrimination: Veith is a Qualified Individual with a Disability

Tyson argues that Ms. Veith cannot establish she was a "qualified individual" because her medical provider recommended a normalized schedule, "e.g., A shift." (ECF 25, MSJ Memo. p. 15-17). In doing so, Tyson relies entirely on its selective version of disputed facts primarily premised on "gotcha" testimony from Veith which has no bearing on whether she was qualified or the realities of the workplace, an outright omission of facts about its rotation schedule, implications of its Sixth and Seventh Day Pay Salaried Production Policy, the denial of Plaintiff's request to talk to her healthcare provider and adjust her medication to work B shift, its mischaracterization of her leave to February as a "mistake," and its refusal to engage in a good faith interactive conversation because it arrived at a pre-determined conclusion before Veith walked in the door.

As an initial matter, Tyson appears to concede Veith has a disability, even though it again omits significant facts about the extent of Veith's disability and treatment. (ECF 25 p. 11-12, 15). Here, Veith had been seeing Hiramoto, a counselor, who used DSM Guidelines to diagnose her with anxiety and bi-polar; she saw a prescribing physician for medication management; and then was referred to another specialist in the field for EMDR therapy. (Hiramoto Dep. 38, 40, 50, Ex. 2 p. 0007, 009, Ex. 5; Luckett Dep. Ex. 24; Blaker Ex. 17). *Morrissey*, 943 F.3d at 1040 (relevant information that a person has a disability "could include, among other things, a diagnosis, a

treatment plan, apparent severe symptoms, and physician-imposed work restrictions").[5] Mental illness like anxiety and depression have routinely been recognized as disabilities covered by the ADAAA. *Hostettler v. City of Wooster*, 895 F.3d at 853-854 (post-partum depression and separation anxiety are disabilities); *Williams v. AT&T Mobility Svcs., LLC,* 186 F. Supp. 3d 816, 825 (W.D. Tenn 2016) (plaintiff granted judgment as a matter of law that her anxiety and depressive disorder were an actual impairment).

To be "qualified" for the job, the employee shows she can perform the "essential functions" of the job, with or without accommodation. 42 U.S.C. § 12111(8); *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 456 (6th Cir. 2004). Generally, the "essential functions" of a job are the functions that are "fundamental," as opposed to marginal, such that a job would be "fundamentally altered" if such a function was removed. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 762 (6th Cir. 2015) (en banc).

In determining which functions qualify as essential, an employer's judgment and the employee's job description prior to litigation are both relevant considerations. *Ford*, 782 F.3d at 761-62; 42 U.S.C. § 12111(8). However, "written job descriptions are...not dispositive." *Rorrer v. City of Stow,* 743 F.3d 1025, 1040 (6th Cir. 2014). Similarly, "courts are not 'required to give deference to [the employer's] judgment regarding what the essential functions of the position [are]' when the record suggests that there" is evidence to the contrary or when evidence is "mixed." *Rorrer,* 743 F.3d at 1039, 1040, 1042 (quoting *Keith v. Cty. of Oakland*, 703 F.3d 918, 925-26 (6th Cir. 2013)). Such countervailing evidence may include "[t]he amount of time spent on the job

---

[5] "The definition of disability" under the ADA "**shall be construed in favor of broad coverage**." 42 U.S.C. § 12102(4)(A) (emphasis added). *Hostettler*, 895 F.3d 844, 853; 29 C.F.R. § 1630.2(j)(1)(i)). In general, a plaintiff does not need to submit scientific, **medical**, or statistical proof to establish a substantial limitation, § 1630.2(j)(v). *Morrissey*, 943 F.3d at 1039. The primary concern of the ADA is "whether covered entities have complied with their obligations and whether discrimination has occurred," not whether an individual's impairment is a disability. 29 C.F.R. § 1630.2(j)(1)(iii). Pertinent major life activities include, but are not limited to, sleeping, concentrating, thinking, communicating and working. 42 U.S.C. § 12102(2)(A).

performing the function[,]" "[t]he consequences of not...perform[ing] the function[,]" or the "work experience" of past incumbents in the same job and current employees in similar jobs. 29 C.F.R. § 1630.2(n); 42 U.S.C. § 12116.

At a minimum, a position's essential job functions "should reflect the actual functioning and circumstances of the particular enterprise involved." *Hall*, 857 F.2d at 1079. The Court must "conduct a fact-specific inquiry into...how the job is actually performed in practice." *Henschel v. Clare Cty. Road Comm'n*, 737 F.3d 1017, 1023 (6th Cir. 2013) (quoting *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013)). "The inquiry into whether a function is essential," and whether an employee can *perform* the essential functions in light of [his] disability, "is highly fact specific." *See Mosby-Meachem*, 883 F.3d at 605; *Hoskins*, 227 F.3d at 726; *Rorrer*, 743 F.3d at 1039. Whether a job function is essential "**is a question of fact that is typically not suitable for resolution on a motion for summary judgment**." *Rorrer,* 743 F.3d at 1039 (emphasis added). Moreover, an underlying failure to accommodate that would have been reasonable does not render an employee unqualified. *Fisher v. Nissan N. Am., Inc*., 951 F.3d at 418.

Here, the facts (which Tyson ignored) demonstrate Veith was qualified:

1) Her written job description does not mention she is required to work 6 or 7 days a week (Veith Dep. Ex. 2).

2) There was a rotational schedule in place that suggests employees could opt to *either* work or receive 6th day pay. (Kuck Dep. 83-84, 98; Jal Dep. 10, Ex. 27 p. 00016; Al-Saadawi Dep. 18, 23; MSJ Ex. 7, Sixth and Seventh Day Pay Salaried Production Policy, Tyson 579-580).

3) The rotation schedule was in operation in the fall of 2018 and renewed with supervisors again in February 2019 where all but one employee opted for their 6th day off which supports Al-Saadawi's admission that a "normalized" rotation schedule was feasible. (Jal Dep. 12; MSJ

Ex. 8, 2/26/19 Selection Forms, Tyson 581-589; Al-Saadawi Dep. 26, Ex. 27), 29 C.F.R. § 1630.2(n)(3)(vi), (vii) (Evidence of whether a particular function is essential includes the work experience of current or past incumbents in the job or similar jobs).

4) The "A- shift" recommendation was a point of interactive discussion, not a mandate, as Kuck erroneously surmised. (Veith Dep. 99, 126, 137, 167; Hiramoto Dep. 72; Kuck Dep. 96; Al-Saadawi Dep. 31).

5) Veith's request to remain off work through her leave period of February 4 to further consult with her healthcare providers and adjust her medication to B shift could have been accommodated and was consistent with Tyson policy. (Veith Dep. 103, 120-121, 136, 151-152; Al-Saadawi Dep. 32; Kuck Dep. 62, 87, 107, Ex. 25 p. 000002; MSJ Ex. 4 1/17/19 Email Luckett [Luckett] to Joyce Brannan, Tyson 623; MSJ Ex. 6, 1/24/19 Email Brannan to Luckett, Tyson 662). *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.,* 155 F.3d 775, 783 (6th Cir.1998) (additional medical leave can constitute a reasonable accommodation); *Coffman v. R.J. Young*, 871 F.2d 703 (M.D. Tenn. 2012)(Haynes) (summary judgment granted to plaintiff because undisputed evidence established plaintiff was qualified to perform essential functions and she could have returned to work with a reasonable accommodation of additional leave where her position was being covered by another employee); *Burress v. City of Franklin, Tenn.,* 809 F.Supp. 2d 795, 812 (M.D. Tenn. 2011) (evidence that plaintiff could have returned to work with a reasonable accommodation--including, a few additional days of leave time and then being permitted to return to work in a light-duty position was enough for a reasonable jury to conclude that he was a "qualified individual").

6) Blaker, the 30-year veteran Tyson nurse, assessed the recommendation and believed a five-day workweek could be accommodated on the basis that Veith was already on B-shift and

"normalized schedule" meant Veith's routine schedule, which would allow her to go to morning counseling appointments. (Blaker Dep. 19, Ex. 22).

7) Tyson admitted it would have considered accommodating Veith if she had a workplace injury, but they failed to do so with her only because her disability was not work related. (Kuck Dep. 74-75, 114; MSJ Ex. 1- Salaried and Management Non-Exempt Short Term Disability Case Management Process, Tyson 599). *See e.g. Young v. UPS*, 135 S.Ct. 1338, 1354 (2015) (a worker can establish her prima facie case [under the Pregnancy Discrimination Act] that the employer accommodated others "similar in their ability or inability to work").

8) Al-Saadawi admitted it could be possible to accommodate a five-day workweek for Veith, with the rotation schedule, however this was never discussed. (Al-Saadawi Dep. 26).

Tyson's myopic focus that a "fundamental piece of Plaintiff's accommodation request was a transfer to A shift," is simply an extension of the pre-determined justification it relied on to deny Plaintiff's accommodation and failure to engage in a good faith interactive process. (ECF 25, MSJ Memo. p. 16). This is exactly the type of logic the Sixth Circuit has repeatedly discouraged. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d at 418; *EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018). Moreover, Tyson misleadingly contends that the positions offered Plaintiff were reasonable accommodations and because she turned down the FSQA position, which was half her pay, and for which she was not qualified, even though it acknowledges none of the positions discussed were truly an option. (ECF 25, MSJ Memo. p. 16; Kuck Dep. 96). Likewise, this ignores the fundamental logic that a comparable position was available, hers, because she could have performed her job with very minor accommodations, *i.e.*, adhering to the rotational schedule that was already in place that other supervisors followed and allowing her to adjust her medication for the B shift during the time she was already granted off to February 4, as recognized by Blaker she could attend

appointments on her days off. Again, ignoring that Al-Saadawi admitted that with the rotation schedule, Tyson likely could have accommodated the 5- day recommendation, but that it simply was never discussed; a blatant admission that not only was Veith qualified but that their "interactive process" meeting was a complete sham. (Al-Saadawi Dep. 26). Tyson's contention that she was unqualified simply ignores the facts. Accordingly, a reasonable jury could conclude the facts establish that Veith was qualified to perform the essential functions of her job.

### 2. Tyson Failed to Engage in the Good Faith Interactive Process & Accommodate

The ADA "mandates an individualized inquiry in determining whether an [employee's] disability . . . disqualifies him from a particular position." *Keith v. Cty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). The individualized inquiry is an "interactive process" in which "both parties have a duty to participate in good faith." *Kleiber,* 485 F.3d at 871. Engaging in "the interactive process requires communication and good-faith exploration of possible accommodations." *Id.* The purpose is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* (citing 29 C.F.R. § 1630.2(o)(3)). "[F]ailure to engage in the interactive process is...an independent violation of the ADA[.]" *Rorrer v. City of Stow,* 743 F.3d 1025, 1041 (6th Cir. 2014) (quoting *Keith*, 703 F.3d at 929). Once the employee "establishes a prima facie showing that he proposed a reasonable accommodation," *Rorrer*, 743 F.3d at 1041, "the employer has the burden of showing how the accommodation would cause an undue hardship," *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202-03 (6th Cir. 2010). If the interactive process was triggered but not successfully resolved, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Kleiber*, 485 F.3d at 871 (quoting *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).

In *Rorrer*, the Sixth Circuit determined that an employer's immediate conclusion that an

employee was unfit to serve suggested bad faith and fell short of its obligations under the ADA to find an accommodation. *Rorrer,* 743 F.3d at 1045; *Mosby-Meachem*, 883 F.3d at 606 (An employer's determination "what accommodation it [is] willing to offer before ever speaking with" the employee does not participate in good faith). Further, if management had a preconceived notion regarding what the essential functions of the position are, there is an indication that the employer lacked good faith. *Rorrer,* 743 F.3d at 1045.

Tyson was the cause of the breakdown. Tyson contends it satisfied its obligation to engage in a good faith interactive process primarily because it offered Veith the FSQA position. (MSJ Memo. p. 20). However, Tyson arrived at a pre-determined conclusion about Veith's accommodation requests (Kuck Dep. 96), it refused to allow her the remainder of the leave she had already been granted to return to work (Kuck Dep. 94-95), they refused to discuss remaining on B shift (Kuck Dep. 96; Al-Saadawi Dep. 31), and they refused to take into account the rotational policy, (Kuck Dep. 97-98) or Blaker's analysis (Blaker Dep. 18). To demonstrate the "interactive process" was not in good faith, Kuck admitted that none of the positions that were offered to Veith were really an option because she did not speak the languages for the interpreter position, the manifester position was not really open (it had already been filled), and the FSQA position was half the pay and still more than five days a week. (Kuck Dep. 96). Thus, Tyson's continued misplaced reliance in its pre-determined meeting with jobs it acknowledges were not even optional demonstrates lack of good faith. *See Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 606 (6th Cir. 2018) (evidence the employer had already determined what accommodation it was willing to offer before ever speaking with the employee created question for jury as to whether employer actually engaged in an interactive process). *Lowe v. Calsonic Kansei N. Am., Inc.*, No. 1:18-CV-00027, 2020 U.S. Dist. LEXIS 84202, at *23 (M.D. Tenn. May

13, 2020) (Campbell, J); *Chaniott v. DCI Donor Servs*., 2020 U.S. Dist. LEXIS 153174 *26-29 (M.D. Tenn. Aug. 24, 2020) (Trauger, J.).

Tyson also claims a reasonable jury could not find it failed to reasonably accommodate Veith because her requests were "unreasonable" and nothing more than a request for less work. (MSJ Memo 17). This is a mischaracterization. Veith was excited to come back work. (Veith Dep. 102). She was not looking for another extension, just the time she had already been granted, per policy, which allowed her 3 months, and a fair discussion as required by the ADA. Additionally, Kuck's testimony that had Veith experienced an occupational injury she would have been put on light-duty, and her schedule could be reduced, and its refusal to discuss this, which is inconsistent with Tyson's STD process is further evidence of failure to accommodate. (Kuck Dep. 74-75, MSJ Ex. 1). Additionally, the same reasons set forth *supra*, that demonstrate Veith was qualified because she could be reasonably accommodated, and Tyson's lack of good faith in the interactive process, Tyson's failure to accommodate is also demonstrated; summary judgment must be denied.

### 3. Tyson's Termination of Veith was Pretext for Discrimination & Retaliation

Tyson claims Veith exhausted her available leave and that the letter from its own corporate office approving her leave did not mean what said or that it was a mistake. (MSJ Memo. 22, 24). To the extent pretext is relevant, Tyson ignores facts, again. However, it is Veith's contention that pretext is largely irrelevant because her termination is premised on a failure to accommodate which is a direct evidence standard. *Morrissey*, 943 F.3d at 1043; *Kleiber*, 485 F.3d at 868; *Chaniott*, 2020 U.S. Dist. LEXIS 153174 *24. Even if this is not the case, the following facts establish Tyson's reason is pretext for discrimination: (1) Luckett was never told she mis-keyed or made a mistake, to the contrary she has been promoted. (Luckett Dep. 6, 29). (2) Kuck signed off on and received a copy of the extension and letter when it went out but said nothing at the time. (MSJ Ex.

3; Luckett Dep. 20-21, Ex. 28; Kuck Dep. 99). (3) Halloran also questioned why Veith was terminated for not coming to work when she had a valid approval in place. (MSJ Ex. 6); (4) No one told Veith her leave was allegedly exhausted until she was terminated. (Kuck Dep. 29). A jury could conclude all of these facts, as well as those previously discussed, establish Tyson's reason was pretext for discrimination. As such, summary judgment must be denied.

### 4. Tyson Retaliated Against Veith After She Requested Accommodation

Tyson claims Veith's retaliation claim is a "re-packaged" accommodation claim. (MSJ Memo.23-24). Not true. "[R]equests for accommodation are protected acts" for the purposes of an ADA retaliation claim. *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422, 2015 WL 5332531, at *7 (6th Cir. 2015) (citing *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013)). Moreover, pretext is demonstrated by the multiple inconsistencies examined at length *supra* with respect Veith's status as a "qualified individual" and interactive process analysis. Ultimately, if Veith had not requested an accommodation she would not have been terminated. *Chaniott*, 2020 U.S. Dist. LEXIS 153174 *31-32. For example, a reasonable jury could find the rotation policy, which was ignored; Blaker's opinion, which was ignored; the refusal to allow Veith to confirm with her provider B shift would be workable; discussion of jobs that were not even options; and Al-Saadawi's testimony that the 5- day request was probably workable, all are facts (among others) that demonstrate Tyson's decision to terminate was pretext for retaliation due to her request for accommodation. (citations, *supra*). Thus, summary judgment is to be denied.

### IV. CONCLUSION

For the foregoing reasons, Plaintiff Veith respectfully requests that the Court DENY Tyson's motion for summary judgment for ADA discrimination, failure to accommodate and failure engage in the interactive process and retaliation.

Respectfully submitted,

*/s Heather Moore Collins*
Heather Moore Collins BPR# 026099
Anne Hunter BPR# 022407
Ashley S. Walter BPR #037651
Collins & Hunter PLLC
7000 Executive Center Drive, Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@collinshunter.com
anne@collinshunter.com
ashley@collinshunter.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 18th day of December 2020, a copy of the foregoing has been furnished via the Court's electronic filing system, or other appropriate means, to:
Kenneth A. Weber, Megan M. Sutton, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.211 Commerce Street, Suite 800, Nashville, Tennessee 37201,
kweber@bakerdonelson.com; msutton@bakerdonelson.com

s/ *Heather Moore Collins*