IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JACQUELYN VEITH,                    )
                                    )
         Plaintiff,                 )
                                    )        NO. 3:19-cv-01065
v.                                  )        JUDGE RICHARDSON
                                    )
TYSON FRESH MEAT, INC.,             )
                                    )
         Defendant.                 )
                                    )
                                    )

## AMENDED MEMORANDUM OPINION

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 24, "Motion"), supported by an accompanying Memorandum of Law. (Doc. No. 25). Plaintiff, Jacquelyn Veith, filed a response (Doc. No. 29, "Response"), and Defendant filed a reply. (Doc. No. 32, "Reply"). For the reasons stated herein, Defendant's Motion will be **GRANTED in part** and **DENIED in part.**

## BACKGROUND[1]

---

[1] Unless otherwise noted, the facts and contentions referred to in this section are taken from Plaintiff's Response to Defendant's Statement of Facts (Doc. No. 30) and Defendant's Response to Plaintiff's Additional Statement of Material Facts. (Doc. No. 33). Facts that are stated herein without qualification are undisputed and treated as such. Alleged facts that are qualified here in some way (as for example by being prefaced with "Plaintiff contends that") are in dispute and are treated as such.

In its response to Plaintiff's additional statement of material facts, Defendant argues that the Court should "strike Plaintiff's additional statements [of fact] and disregard them" because Plaintiff failed to comply with Local Rule 56.01(c), which requires the statement of material facts to put each fact in a separate, numbered paragraph. (Doc. No. 33 at 1-2). The Court presently declines to disregard Plaintiff's additional statement of facts due to non-compliance with the Local Rules, but Plaintiff's counsel is encouraged to ensure strict compliance in future filings lest this Court (or another) be less forgiving.

## I. Plaintiff's Employment with Defendant

On February 12, 2018, Defendant hired Plaintiff as a Production Supervisor on B Shift at its plant located in Goodlettsville, Tennessee. (Doc. No. 30 at 1). Plaintiff's responsibilities as a Production Supervisor included meeting production schedules, achieving department and plant objectives, and supervising 48 hourly employees who worked on her production lines. (*Id.*). As part of her supervisory duties, Plaintiff was also tasked with handling disciplinary issues, vacation and leave requests, and time and attendance for her hourly employees. (*Id.* at 2). Typically, B Shift production ran from 2:00 p.m. until 11:00 p.m. (*Id.*). When production would end, Plaintiff was also responsible for drafting detailed reports about her lines' efficiencies, quality issues, and overall performance. (*Id.*). This often required her to work later than 11:00 p.m. (*Id.* at 3). In addition, Plaintiff was occasionally required to work six days a week, a requirement of which she was informed when she was hired. (*Id.*). However, Tyson did not advertise six-day work weeks as an essential feature of the position. (Doc. No. 33 at 2).

For most of her time with Defendant, Plaintiff reported to General Manager Molly Winkle. (Doc. No. 30 at 3-4). But in October 2018, Plaintiff started reporting to newly promoted General Manager, Kim Jal ("Jal"). (*Id.* at 4). On October 26, 2018 an incident occurred between Plaintiff and fellow Production Supervisor Elizabeth Fournier ("Fournier"), when Plaintiff entered a supervisor's office where perfume was being sprayed. (*Id.*). Plaintiff asked for the spraying to stop, and Fournier reportedly stated, "Quick, spray more." (*Id.*) Plaintiff reported this incident to Human Resources Manager, Scott Kuck ("Kuck"). Another incident occurred sometime later when Jal asked Plaintiff to run a product on her production line that A Shift was unable to complete. (*Id.* at 5). This request caused Plaintiff stress as she was concerned that her team could not run the product correctly, and Jal was unhelpful when Plaintiff tried to discuss her concerns. (*Id.*).

## II. Plaintiff's Alleged Disability and Defendant's Termination of Plaintiff

In response to her increased stress, Plaintiff met with therapist Bethanie Hiramoto ("Hiramoto") on November 11, 2018. (Doc. No. 33 at 10). Hiramoto initially diagnosed Plaintiff with unspecified Anxiety Disorder. (*Id.*). On that same day, Plaintiff gave Defendant a note from Hiramoto that said Plaintiff needed time off work from November 12-19, 2018, which was approved. (Doc. No. 30 at 7). On November 18th, Plaintiff gave Defendant a second note requesting an extension of her leave until December 11, 2018, which was also approved. (*Id.*). On December 9th, Plaintiff produced a third note from Hiramoto, requesting another extension until January 7, 2019, which was again approved. (*Id.*).

On January 4, 2019, Plaintiff provided a fourth note requesting an extension until February 4, 2019. (*Id.*). The circumstances surrounding what happened with this request are disputed, but it seems that Plaintiff received some sort of letter purporting to approve this additional leave. (Doc. No. 33 at 13). However, Defendant contends this letter was generated by mistake and was not meant to actually approve Plaintiff's request, because she had used up all her allotted leave-of-absence time. (*Id.*). Defendant's Leave of Absence Policy allowed employees who had been employed between three months to one year to take three months of leave. (Doc. No. 33 at 4). In addition to her leave requests discussed above, Plaintiff previously had taken leave from August 29 to September 24, 2018 for a non-work-related injury. (Doc. No. 30 at 8). The maximum leave time allotted to Defendant's employees could not be exceeded unless approved by the Vice President, HR Operations, the HR Director, or as required by law. (Doc. No. 33 at 4.).

On January 15, 2019, Plaintiff sent Kuck an email that stated the accommodations advised by Hiramoto, which included a "normalized schedule (ex. A shift)," a work week of no more than five days, and permission for Plaintiff to attend all therapy and medication-management

appointments. (Doc. No. 30 at 9). Despite being invited to do so, Kuck did not contact Hiramoto for clarification on whether the accommodation requests were, in Hiramoto's view, subject to compromise. (Doc. No. 33 at 16). After receiving Plaintiff's email, Defendant's Human Resources Department scheduled a meeting with her. (Doc. No. 30 at 11). This meeting occurred on January 18, 2019 between Plaintiff, Kuck, and Operations Manager Falah Al-Saadawi ("Al-Saadawi"). (*Id.*). During the meeting, Kuck reviewed with Plaintiff the open non-management positions on A-Shift. (*Id.* at 13). Defendant contends that no A-Shift Production Supervisor positions were available. (*Id.* at 15). The non-management openings included interpreter positions and Food Safety Quality Assurance ("FSQA") positions. (*Id.* at 13). Plaintiff was not qualified for the interpreter position and turned down the FSQA position because she thought the pay was too low. (*Id.*).

At the meeting, Plaintiff asked whether she could be placed in a Floater Supervisor Position, though these are usually reserved for senior and experienced supervisors who are being groomed for promotions to General Manager. (*Id.* at 17). Plaintiff's request was rejected. (*Id.*). At the meeting, Plaintiff also asked for (1) some time to obtain clarification from Hiramoto about what a "normalized" schedule meant, (2) more time to determine whether Hiramoto would change her proposed accommodations, and (3) more time to adjust to her medication. (*Id.* at 18). These requests were not granted (whether because they were actually denied or because they were never acted upon), and Plaintiff was terminated from her position on January 18, 2019. (*Id.* at 20).

### III. Procedural Posture

Plaintiff filed the present action on November 26, 2019. Her first cause of action alleged the following violations of the Americans with Disabilities Act ("ADA") and the Americans with Disabilities Act Amendments Act ("ADAAA"): failure to accommodate; failure to engage in the

interactive process; disability discrimination; and retaliation.[2] Her second cause of action alleged disability discrimination and retaliation under the Tennessee Disability Act ("TDA"), and her third and final cause of action alleged a violation of the Family and Medical Leave Act ("FMLA").

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

---

[2] Plaintiff's Complaint states under the heading for Count One "Violation of ADA/ADAAA-Disability Discrimination/Retaliation." (Doc. No. 1 at 5). The heading fails to mention a claim for failure to accommodate or failure to engage in the interactive process. However, Plaintiff proceeds to mention both a failure-to-accommodate claim and a failure-to-engage-in-the-interactive-process claim in her paragraphs below the heading. (*Id.*). In its Motion, Defendant notes, "It is unclear from Plaintiff's Complaint whether she is alleging separate claims for failure to accommodate and discriminatory discharge or whether she is presenting a claim for failure to engage in the interactive process. In an abundance of caution, therefore, Tyson will address all of these theories . . ." (Doc. No. 25 at 1). In her Response, Plaintiff does not indicate Defendant's interpretation of her first cause of action is incorrect and argues for why summary judgment should not be granted on all four claims, Therefore, the Court will proceed as if Plaintiff brought four distinct claims under the ADA/ADAAA in her first cause of action.

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support a material fact (for example, the existence of an element of a nonmovant plaintiff's claim)." Fed R. Civ. P. 56(c)(1)(B). If the summary judgment movant meets its initial burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

Consistent with the above observations made specifically about a defendant-movant seeking summary judgment on a plaintiff's claims, any party asserting that a fact cannot be or genuinely is disputed—i.e., any party seeking summary judgment and any party opposing summary judgment, respectively—can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact.

In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844,

852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question.[3] *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at *5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

## DISCUSSION

Via the Motion and Memorandum in Support, Defendant moves for summary judgment on all of Plaintiff's claims. The Court will discuss each of these claims in turn.

### I. Failure to Accommodate

ADA claims premised on a failure to accommodate "necessarily involve direct evidence and the [*McDonnell-Douglas*] burden shifting approach is not applicable."[4] *Fisher v. Nissan N.*

---

[3] Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

[4] It would be inaccurate to say that *no* kind of burden shifting is applicable here. As explained below, even under the direct-evidence approach, a kind of burden-shifting *is* contemplated. So *Fisher*'s reference here must be to the inapplicability of the *McDonnell-Douglas* kind of burden-shifting in particular.

*Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020); *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) ("Because 'not making reasonable accommodations' is listed in the ADA's definition of disability discrimination, *see* 42 U.S.C. § 12112(b)(5)(A), 'claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination.'"). Accordingly, such claims are analyzed "under the direct-evidence framework, which requires that [Plaintiff] establish that (1) she "is disabled," and (2) that she is "'otherwise qualified' for the position despite . . . her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." [5] *Wyatt v. Nissan North America, Inc.*, 999 F.3d 400 (6th Cir. 2021) (quoting *Fisher*, 951 F.3d at 417). To be clear, a plaintiff must show these elements—which the Court will refer as the elements of a *prima facie* case of failure to accommodate[6]—to

---

[5] Notably, the second of the three options for satisfying the second element of the *prima facie* case (*i.e.*, showing that the plaintiff is qualified for the job with a job requirement eliminated) is fully encompassed within the third option (*i.e.*, showing that the plaintiff is qualified for the job with a proposed reasonable accommodation) *when the proposed reasonable accommodation is the elimination of a job requirement*. That is, if the plaintiff has shown that the elimination of a job requirement is a *reasonable* accommodation, the plaintiff necessarily also has shown that the plaintiff is qualified for the job with that job requirement eliminated. On the other hand, the second requirement can be satisfied even if the third requirement is not; a plaintiff can be qualified for a job with a particular job requirement eliminated even if the proposed elimination of such job requirement is not a reasonable proposed accommodation because the job requirement turns out to be essential.

Finally, the Court notes that at times courts, like the Sixth Circuit in *Wyatt*, speak in terms of a plaintiff being "disabled" rather than in terms of "having a disability." This is unfortunate not only because the former terminology well may be more incentive, but also because the statute used the latter rather than the former terminology.

[6] Usually, in the employment discrimination context, a reference to a "*prima facie* case" is a reference to an indirect-evidence *prima facie* case. But the term appropriately can be used to refer also to a direct-evidence *prima facie* case. "In other words, the notion of a '*prima facie* case' applies in the direct-evidence context as well as in indirect-evidence context, where the actual term itself is used more frequently. The upshot of establishing a *prima facie* case in either context is that it shifts the burden to the defendant, but the burden thus shifted is different in the direct-evidence context than in the indirect-evidence context."

establish a claim for failure to accommodate under the ADA, but a plaintiff that does so need not survive the second and third stages of an indirect-evidence analysis under *McDonnell Douglas*, because *McDonnell Douglas* is simply inapplicable.[7] Instead, if the plaintiff establishes a *prima facie* case of failure to accommodate, the defendant "[i]n turn bears the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon [the defendant]."[8] *Fisher*, 951 F.3d at 417 (internal quotation marks omitted). The Court will refer to these two alternatives —showing that a challenged job criterion is essential and showing that the proposed accommodation will impose

---

*Grizzard v. Nashville Hosp. Cap., LLC*, No. 3:18-CV-00034, 2021 WL 3269955, at *19 (M.D. Tenn. July 30, 2021). Because there is no such thing as an indirect-evidence theory of failure to accommodate, any reference to a *prima facie* case of failure to accommodate is a reference to a direct-evidence theory of failure to accommodate, and so there is no need to qualify the reference with the phrase "direct evidence." But as for other kinds of discrimination claims, which can be pursued under either a direct-evidence theory or an indirect-evidence theory, each of which implicate a "*prima facie* case," it can be helpful to qualify the term "*prima facie* case" with the term "direct-evidence" or "indirect-evidence" as appropriate, and the Court will do so herein.

[7] The *McDonnell Douglas* analytical framework, referenced here, applies to a wide variety of employment discrimination claims (including those under the ADA/ADAAA) to the extent that they are based on indirect (*i.e.*, circumstantial) evidence. The applicability and workings of the *McDonnell Douglas* burden shifting framework are discussed below. But for now, suffice it to say that a failure-to-accommodate claim (as opposed to a general discrimination claim*, i.e.* a claim that the plaintiff suffered an adverse employment action based on her membership in a protected class, in this case the class of persons with a disability) under the ADA is necessarily shown by direct, and not indirect, evidence. By contrast, as Plaintiff correctly notes, (Doc. No. 29 at 16), "ADA discrimination claims are analyzed under two different rubrics, depending on whether the plaintiff relies on 'direct' or 'indirect' evidence of discrimination." *Morrissey v. Laurel Health Care Co.*, 943 F.3d 1032, 1037 (6th Cir. 2019).

[8] It seems that these defenses naturally would overlap whenever the proposed accommodation is the elimination of a job requirement that the defendant claims is essential. In that case, the proposed accommodation (the elimination of the job requirement) seemingly would be an undue burden on the defendant precisely because (the proposed accommodation) it is the elimination of an *essential* requirement; surely it is an undue burden on an employer to have a positions staffed by, and to pay full salary to, a person who does not (because she cannot because of her disability) perform the essential functions of the job. Nevertheless, the Court treats them as two separate defenses in any case.

an undue hardship on the defendant—as "defenses," although perhaps that term is not technically the most precise word for their role.

So, on a defendant's motion for summary judgment with respect to a failure-to-accommodate claim, the question is whether the defendant has shown that the plaintiff cannot raise a genuine dispute of material fact as to either (i) the non-existence of at least one of the two elements of the plaintiff's *prima facie* case, or, alternatively, (ii) the existence of at least one of the two alternative defenses. A defendant can choose either (a) to focus only on the initial showing that plaintiff cannot establish a *prima facie* case; (b) to make each of the above two showings in turn, or (c) to skip the first option and proceed directly to attempting to show that there is no genuine dispute as to the applicability of one of the defenses.

Not insignificantly, one part of the analysis of the plaintiff's *prima facie* case overlaps with one part of the analysis of whether the defendant has met its burden to establish one of the two defenses (assuming that the plaintiff successfully shifted such burden to the defendant). Specifically, "[i]n failure-to-accommodate claims where the employee requests an 'accommodation that exempts her from an essential function,' 'the essential functions and reasonable accommodation analyses run together.' One conclusion (the function is essential) leads to the other (the accommodation is not reasonable)." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 763 (6th Cir. 2015) (quoting *Samper v. Providence St. Vincent Med. Ctr.,* 675 F.3d 1233, 1237–38 (9th Cir. 2012)). In other words, if the defendant has a valid defense that the job requirement proposed by the plaintiff to be eliminated—and thereby make her qualified under the *remaining* job criteria—is "essential," that necessarily means that the proposed elimination of such requirement is not a "reasonable accommodation" for purposes of the *third* alternative for

satisfying the second element of the plaintiff's *prima facie* case.[9] However, even if the job requirement proposed to be eliminated is essential, a plaintiff still can satisfy the *second* alternative.[10] In other words, the second alternative does not require the Plaintiff to show that the job requirement to be eliminated is actually *essential.*[11]

Here, Plaintiff's requested accommodation was a "normalized work schedule and a 5-day work week." (Doc. No. 1 at 5). And she implies that she was qualified for her job with any

---

[9] It is worth emphasizing that this principle implicates only the *third* alternative for establishing the second element of the *prima facie* case, *i.e.*, showing that the plaintiff would be "qualified . . .. with a proposed reasonable accommodation." That is, a plaintiff cannot show that she is qualified with a proposed *reasonable* accommodation when the proposed accommodation is the elimination of a job requirement that is essential; in such a case the proposed requirement is *not* reasonable and so the third alternative by its very terms is not satisfied. On the other hand, the second alternative is not implicated; a plaintiff can satisfy the second alternative by showing that she is qualified with a particular job requirement eliminated even if that job requirement is not actually (as opposed to merely allegedly) essential.

[10] As noted in the footnote above, if a plaintiff is qualified with the elimination of a particular job requirement plaintiff proposes to be eliminated, then the plaintiff satisfies the second alternative for satisfying the second element of the plaintiff's *prima facie* case irrespective of whether that job requirement is actually essential.

[11] *Wyatt* characterizes a plaintiff's second alternative for satisfying the second element of a *prima* facie case as establishing that the plaintiff was "qualified . . . with an *alleged* essential job requirement eliminated." *Wyatt*, 999 F.3d at 400. Thus, at most, this alternative requires only that the job requirement to be eliminated be merely *allegedly*—as opposed to actually—essential.

One might reasonably wonder, however, whether even mere *alleged* essentiality is truly required. Perhaps *Wyatt* was unintentionally indicating the existence of a requirement that does not in fact exist. *Wyatt* makes it sound as if the plaintiff can satisfy this alternative by showing that she would be qualified with a job requirement eliminated *only if* such job requirement has been alleged by the defendant to be essential. But surely this is not so; it must be that a plaintiff can satisfy this alternative by showing that the elimination of a particular job requirement would render her qualified, without having to show from the get-go that such job requirement was alleged by the defendant to be essential. Indeed, it would seem that the plaintiff's overall position is stronger if the job requirement she proposes to be eliminated (thus leaving her qualified) is not even alleged to be essential. The issue of whether the job requirement to be eliminated is essential actually need not, and surely does not, arise unless and until the burden shifts to the defendant to offer a defense, at which time the defendant may choose to assert that the job requirement is essential. So the Court proceeds accordingly, reading the second alternatively as if it referred simply to the plaintiff being "qualified with a particular job requirement eliminated." This is not merely an academic point, but one with practical consequences—one of which is that all discussion herein about a job requirement being "essential" is irrelevant to whether the plaintiff has satisfied the second alternative for satisfying the second element of the plaintiff's indirect-evidence *prima facie* case—a requirement that actually relates to a job requirement (proposed by the plaintiff to be eliminated) irrespective of whether it is "essential."

requirement for more hours and days eliminated. Defendant does not really challenge this implication. And so the Court finds that Defendant has failed to show that Plaintiff cannot satisfy the second element of her *prima facie* case (more specifically, the second alternative for satisfying the second element).[12] And Defendant likewise has not shown (or even attempted to show) that Plaintiff cannot satisfy the first element, *i.e.*, that Plaintiff had a disability. So the burden shifts to Defendant to show the absence of a genuine dispute as to one of the two possible defenses.

Defendant raises only one of the two possible defenses. Namely, it argues in essence that Plaintiff has challenged a job requirement that is essential.[13] As noted, Plaintiff's requested accommodation was a "normalized work schedule and a 5-day work week." (Doc. No. 1 at 5). In essence, she challenges Defendant's requirement to work more than "normal" hours and more than 5 days a week. Defendant contends that this challenged job requirement is essential—that an essential function of Plaintiff's job is working 70-80 hours and up to six days a week (rather than a "normalized" and five-days-per-week schedule). (Doc. No. 25 at 15-16).

---

[12] This is true whether or not Plaintiff's proposed elimination of any requirement for longer hours is a "reasonable accommodation" so as to enable her to satisfy the third alternative.

[13] Defendant does not really frame this argument as a *defense* to Plaintiff's claim. Defendant argues instead that because the challenged job requirement is essential, and because Plaintiff cannot satisfy that requirement and proposes instead that she be accommodated by being relieved of this requirement, Plaintiff is not a *qualified* person with a disability and has not requested a *reasonable* accommodation. (Doc. No. 25 at 14-18). In so doing, Defendant clearly is claiming that Plaintiff cannot meet the elements of her *prima facie* case. But as suggested in part above, Defendant's attack on Plaintiff's *prima facie* case falls flat. Defendant's argument obviously does nothing to undermine the first element, *i.e.*, that Plaintiff has a disability. And it plainly fails to undermine the *second alternative* for satisfying the second element, *i.e.*, that Plaintiff was qualified *with an alleged essential job requirement eliminated*; Plaintiff obviously could conceivably show this even if Defendant successfully undermines the *first and third alternatives* for satisfying this element by showing that Plaintiff could not perform the job without being granted the accommodation of having this particular alleged essential job requirement eliminated.

As noted, Defendant did not identify the alleged essentialness of the job requirement as a matter pertaining to a *defense*, as would have been ideal. However, Defendant is so express and intentional about arguing that the challenged job requirement was essential that the Court finds it appropriate to consider that argument where it is most directly applicable: on the issue of whether Defendant, in response to receiving the burden to establish a defense, has established the *defense* that the challenged job requirement is essential.

To determine whether Defendant has established this defense sufficiently to prevail on summary judgment by virtue of it, the Court must first determine whether Defendant has shown that Plaintiff would be unable to raise a genuine dispute that 70-80-hour and six-day work weeks are an essential function of a Production Supervisor position at Defendant's plant. To support its contention that it has made this showing, Defendant points to Plaintiff's deposition where she notes she "frequently [] would not leave the plant until well after 2:00 in the morning," and was working between 70-80 hours and six-days a week for months. (Doc. No. 27-1 at 9, 28). Additionally, Defendant cites to the deposition of Scott Kuck, where he notes production at the plant was running six-days a week during 2019. (Doc. No. 27-2 at 13).

The EEOC regulations provide insight regarding what constitutes an "essential function":

(1) In general. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:
    (i) The function may be essential because the reason the position exists is to perform that function;
    (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
    (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:
    (i) The employer's judgment as to which functions are essential;
    (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
    (iii) The amount of time spent on the job performing the function;
    (iv) The consequences of not requiring the incumbent to perform the function;
    (v) The terms of a collective bargaining agreement;
    (vi) The work experience of past incumbents in the job; and/or
    (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n). Defendant's evidence appears to fall into the category of "work experience of past incumbents," and does suggest that there may be no genuine dispute as to whether the challenged job requirement (the work schedule of 70-80 hours and six days per week) is essential.

However, Plaintiff argues that a six-day, 70–80-hour work week is not an essential function of a Production Supervisor, and she therefore could have performed the position with her requested accommodations in place. Plaintiff points to the written job description of a Production Supervisor, which does not list a 70-80 hour or six-days a week requirement. (Doc. No. 31-9 at 1). She additionally notes that Defendant used a rotation schedule for some employees, which allowed, but did not *require*, them to opt-in for a sixth day during the work week. (Doc. Nos. 31-2 at 22, 31-3 at 6,7, 31-6 at 4, 31-1 at 14). Then Plaintiff points to testimony from Al-Saadawi acknowledging that Defendant may have been able to accommodate Plaintiff with a five-day work week using said rotation schedule. (Doc. No. 31-3 at 8).

"Determining whether a function is essential 'is a question of fact that is typically not suitable for resolution on a motion for summary judgment.'" *Rorrer v. City of Stow*, 743 F.3d 1025, 1043 (6th Cir. 2014) (quoting *Keith v. County of Oakland*, 703 F.3d, 918 926 (6th Cir. 2013)). With that in mind, the Court believes Defendant has not pointed to enough evidence whereby a reasonable jury could not find that 70-80-hour and six-day work weeks are not an essential function of the Production Supervisor position. Accordingly, Defendant has failed to show an absence of a genuine dispute as to the validity of its defense, and Defendant's Motion will be denied with respect to Plaintiff's failure-to-accommodate claim.[14]

---

[14]Defendant makes the additional argument based on what it essentially contends was an offer of a reasonable accommodation made by *it* (as contrasted with *Plaintiff's* proposal for a very different alleged reasonable accommodation that is discussed throughout this opinion). Specifically, Defendant argues that Plaintiff cannot be a qualified individual (with a disability) because she declined Defendant's offer of an

## II. Failure to Engage in the Interactive Process

Defendant next challenges Plaintiff's claim for failure to engage in the interactive process. But before considering Defendant's argument, the Court must initially determine whether Plaintiff is able to bring an independent claim for failure to engage in the interactive process. "Most courts hold that an employer's failure to engage in the interactive process is not an independent legal violation." BARBARA T. LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 922 (C. Geoffrey Weirich ed., 4th ed. 2007); *see also Matos v. DeVos*, 317 F. Supp. 3d 489, 497 (D.C.C. 2018) ("There is no independent cause of action for failure to engage in the interactive process—under the ADA . . . there is only a cause of action for failure to accommodate generally."); *Whelan v. Teledyne Metalworking Prods*., 226 F. App'x 141, 147 (3d 2007) (indicating that a failure-to-engage-in-the-interactive-process claim is not an independent cause of action); *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001) ("[T]he failure to engage in the interactive process by itself does not give rise to relief."); *Fjellestad v. Pizza Hut of Am., Inc*., 188

---

FSQA position on A-Shift. (Doc. No. 25 at 16-17). For this proposition, Defendant cites *Zaffino v. Metro. Gov't of Nashville & Davidson Cty*., No. 3:14-CV-1909, 2016 WL 5724187, at *6 (M.D. Tenn. Sept. 30, 2016), which says "The law is clear that an individual will no longer be considered a 'qualified individual with a disability' if she rejects a reasonable accommodation." However, this quote is missing important context. To support this proposition, *Zaffino* quotes 29 C.F.R. § 1630.9(d) (2011), which reads "An individual with a disability is not required to accept an accommodation . . . However, if such individual rejects a reasonable accommodation . . . that is necessary to enable the individual to perform the essential functions of the position . . . , the individual will not be considered qualified." This additional language suggests that an individual will not be deemed qualified if she rejects a reasonable accommodation offered by the *defendant* (as contrasted with the situation, presented in the current case, where the proposed accommodation is offered by the plaintiff) that would allow her to remain qualified for her *existing* position (by enabling her to perform essential functions for that position that she otherwise could not perform). So *Zaffino* does not stand for the proposition that an individual cannot be deemed qualified if she rejects an offer of an entirely different position, and Defendant leaves no doubt that this was a different position from Plaintiff's existing position—a reality that is ever more apparent if one considers that it was a significant reduction in pay from what her existing position paid. (Doc. Nos. 29 at 11, 33 at 19). Therefore, Plaintiff did not have to accept the FSQA position to be considered a qualified individual.

F.3d 944, 952 (8th Cir. 1999) ("[T]here is no per se liability under the ADA if an employer fails to engage in an interactive process.").

The Sixth Circuit has stated, "In this circuit, failure to engage in the interactive process does not give rise to an independent claim. Instead, it is a violation of the ADA only if the plaintiff establishes a prima facie case of failure to accommodate." *Thompson v. Fresh Prod., LLC*, 985 F.3d 509, 525 (6th Cir. 2021). It is unclear whether the reference here to an independent "violation" of the ADA is intended to mean an independent *cause of action under* the ADA, but that seems unlikely because the court had just stated without qualification that failure to engage in the interactive process does not give rise to an independent claim. So this Court is not prepared to accept this as a recognition of an independent cause of action absent further support for such recognition, especially since the weight of authority rejects that approach.[15] This is partially because the Court can find no case law laying out the elements of a claim (or *prima facie* case) of failure to engage in the interactive process, which presumably would be an easy task if such a claim actually existed independently. In fact, the Court could find only one Sixth Circuit case— an unpublished one—even acknowledging the standard that would be applicable to a failure-to-engage claim. *See O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 614 (6th Cir.

---

[15] Other cases support this approach. In *Kleiber*, the court analyzed a failure-to-engage-in-the-interactive-process argument as if it were a part of a failure-to-accommodate claim. 485 F.3d at 871; *see also Wardia v. Just. & Pub. Safety Cabinet Dep't of Juv. Just.*, 509 F. App'x 527, 532 (6th Cir. 2013) ("But an interactive-process argument simply does not create an independent ground to support an ADA violation beyond standard reasonable-accommodation analysis."). The idea seems to be that one way of proving that, or telling the story about how, the defendant denied the plaintiff an allegedly reasonable accommodation is to show that the defendant was resistant even to engage with the plaintiff on the subject—that this is the true (limited) significance of the defendant failing to engage in the interactive process. And district courts within the Sixth Circuit have followed suit. *See Doe v. Directions for Youth & Families, Inc.*, No. 15-cv-2861, 2016 WL 6093370, at *8 (S.D. Ohio Oct. 19, 2016) (specifically coining the term "accommodation claim," to refer to the plaintiff's claim that the defendant failed to engage with the plaintiff in an interactive process seeking a reasonable accommodation for her disability).

2020) (stating that a failure-to-engage claim is "evaluated under the direct-evidence standard" like a failure-to-accommodate claim). Additionally, this Court is not even sure what potential damages a plaintiff could allege under a failure-to-engage-in-the-interactive-process claim that would not be fully covered by a failure-to-accommodate claim; that is to say that it seems that a plaintiff would not have any appreciable damages stemming from the mere fact that the defendant failed to interact or engage with her regarding reasonable accommodations;[16] any damages would flow from the defendant denying the plaintiff her requested accommodation. For these reasons, the Court determines that Plaintiff cannot bring an independent claim for failure to engage in the interactive process, and therefore it need not consider Defendant's arguments in favor of summary judgment on this "claim".

### III. Disability Discrimination

Plaintiff's Complaint states that Defendant violated the ADA/ADAAA when it "discriminated against [her] by refusing to accommodate her and by terminating her during her approved medical leave after she requested accommodations." (Doc. No. 1 at 6). The first part of this sentence merely reiterates Plaintiff's above-analyzed failure-to-accommodate claim and does not suggest any other variety of disability discrimination; as the failure-to-accommodate claim has been addressed above, it need not be addressed again here. The second part of the sentence is, regrettably, unclear as to whether it is alleging termination based on her protected *status* (a person with a disability) or termination based on her undertaken protected *conduct* (requesting accommodations for her disability); this is a distinction with a difference, because the first possibility is an allegation of *general disability* discrimination in violation of the ADA/ADAAA,

---

[16] It would seem that a defendant's mere refusal to engage, by itself, would occasion injury no more serious than indignation or hurt feelings at being ignored and the relatively minor inconvenience of wasting time on trying unsuccessfully to get the defendant's attention on the issue of reasonable accommodation.

while the second is an allegation of *retaliation* in violation of the ADA/ADAAA. The second possibility is dealt with below.

As for the possible allegation of general disability discrimination—termination allegedly motivated by Plaintiff having a disability, the Court will proceed as if such an allegation was in fact made. Defendant does likewise,[17] noting that "[i]t appears that Plaintiff also intends to pursue a discriminatory discharge claim under the ADA and TDA." (Doc. No. 25 at 21).

As suggested above, claims of general disability discrimination can be pursued based on direct evidence or indirect evidence. Plaintiff does not offer any direct evidence that she was discriminated against based on her membership in the protected class of persons with disabilities; that is, she does not offer any evidence that would require the conclusion, without resort to the drawing of inferences, that her termination was motivated by discriminatory animus towards persons with disabilities (or, to put it just slightly differently, by animus against Plaintiff because she is a person with a disability).

Thus, Plaintiff's claim of general disability discrimination stands or falls on an indirect-evidence theory, which can be pursued in the manner and under the procedure cogently summarized as follows:

> [A] plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).
>
> To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence. . . . Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must

---

[17] Defendant's use of the word "appears" is quite apt since Plaintiff did not make this as clear as she should have.

prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (citations omitted). While the above quote references Title VII discrimination, *McDonnell Douglas* is likewise applicable to claims under the ADA/ADAAA that rely on indirect evidence. *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008).

When a defendant-movant challenges a plaintiff's ability to reach a jury on an indirect-evidence theory of employment discrimination, there are a number of steps potentially implicated, though not all of them necessarily need be addressed in the analysis. The number of steps to be addressed depends on whether the defendant-movant seeks to prevail at the first step, or at the second and third step,[18] or at both the first step and the second and third step. Here, as further explained below, Defendant attempts to prevail at both the first step (*i.e.*, by contesting Plaintiff's ability to reach a jury on her indirect-evidence *prima facie* case), and at the second and third steps (by asserting that it had a legitimate, non-discriminatory reason and contesting Plaintiff's ability to reach a jury on the issue of whether such reason was pretextual). The Court thus explains all of the analytical steps applicable to this kind of two-pronged (as opposed to single pronged) attack in the specific context of a motion for summary judgment.

To prevail at the first step of *McDonnell-Douglas*, the defendant, as the summary-judgment movant, must meet its initial burden of showing an absence of evidence from which a reasonable jury could find the plaintiff established a *prima facie* case. *E.g.*, *Banks v. State of Ohio*, No. 94–3866, 1995 WL 118993, * 2 (6th Cir. Mar. 20, 1995). If the defendant does so, then the burden

---

[18] A defendant-movant properly can choose to forgo a challenge the plaintiff's indirect-evidence *prima facie* case and instead proceed directly to the second step of showing a legitimate, non-discriminatory reason for its termination of plaintiff, in hopes of reaching the third step.

shifts to the plaintiff to show that at trial it could "make out a *prima facie* case of discrimination by a preponderance of the evidence." *Redlin*, 921 F.3d at 606. If the plaintiff fails to succeed here, then the plaintiff suffers summary judgment in favor of the defendant on the claim. But if the plaintiff succeeds here, defendant does not prevail at the first step and is relegated to try instead to prevail at the second and third steps of *McDonnell-Douglas*.

At the second step, the defendant-movant has the burden (of production only[19]) to show a legitimate and non-discriminatory reason for its action(s). *Brown*, 814 F. App'x at 80 (noting, on the defendant's motion for summary judgment that it is a "burden of production [that potentially] shifts to the defendant to show a legitimate, nondiscriminatory reason for the way it treated the plaintiff"). If the defendant successfully shows evidence of a non-discriminatory reason for its alleged discriminatory act, the court proceeds to the third step, where "the plaintiff must rebut the proffered reason by producing evidence from a which a reasonable jury could conclude that the proffered reason is actually a pretext" for unlawful discrimination. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020) (quotations omitted). The undersigned has previously summarized how the indirect-evidence framework applies to claims of general discrimination (and, for that matter, retaliation) on motions for summary judgment:

> To obtain summary judgment on Title VII or THRA claims grounded exclusively on the so-called "indirect-evidence" theory, the defendant must either (i) show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of that element); *or*, failing that, (ii) (a) make an evidentiary showing that there was a legitimate, nondiscriminatory reason for its alleged actions and then (b) show that there is no genuine issue of material fact as to pretext (such that the defendant necessarily is

---

[19] A burden of production means that the defendant merely has to offer admissible evidence adequate to support a finding that the defendant had such a reason. By contrast, a burden of persuasion would require the defendant-movant to show that no reasonable jury could fail to find that the defendant-movant had such a reason. *See Benitez v. Tyson Fresh Meats, Inc*., No. 3:18-CV-00491, 2022 WL 58399, at *22 (M.D. Tenn. Jan. 5, 2022).

entitled to judgment as a matter of law based on the absence of pretext). On the other hand, the plaintiff will avoid summary judgment if : (i) either (a) the defendant fails to meet its initial burden to show the lack of a genuine issue of material fact as to any or more elements of the plaintiff's indirect-evidence *prima facie* case, *or* (b) the plaintiff presents sufficient evidence to demonstrate a genuine issue of material fact as to any element(s) of such *prima facie* case as to which the defendant met its initial burden to show the lack of a genuine issue of material fact; and (ii) either (a) the defendant cannot make an evidentiary showing of a legitimate, nondiscriminatory reason for its alleged actions, or, if the defendant can make such a showing, (b) the plaintiff demonstrates that there is a genuine issue of material fact as to pretext.

*Benitez v. Tyson Fresh Meats, Inc.*, No. 3:18-CV-00491, 2022 WL 58399, at *23 (M.D. Tenn. Jan. 5, 2022). With these analytical principles in mind, the Court proceeds to Defendant's argument in favor of summary judgment as to Plaintiff's disability discrimination claim.

At step one of the *McDonnell-Douglas* framework, Defendant initially challenges the ability of Plaintiff to raise a genuine issue of fact as to one particular element of an indirect-evidence *prima facie* case of disability discrimination.[20] This challenge is based on the argument that Plaintiff cannot establish that she is a qualified individual with a disability, with or without

---

[20] Defendant identifies this as the second of five elements of such *prima facie* case: (Doc. No. 25 at 21) ("[T]o establish a *prima facie* case of disability discrimination, separate from a failure to accommodate claim, a plaintiff must establish: (1) that she is disabled; (2) that she is otherwise qualified for the position, with or without reasonable accommodation; (3) that she suffered an adverse employment action; (4) that the employer knew or had reason to know of her disability; and (5) her position remained open while defendant sought other applicants or replaced her") (citing *Vasser v. Shiroki N. Am., Inc*., 2:19-cv-00098, 2020 WL 1905182, at *5 (M.D. Tenn. Apr. 17, 2020)). The second element reflects a major difference between an indirect evidence *prima facie* case of general disability discrimination and a (direct evidence) *prima facie* case of failure to accommodate. To establish the second element of the former case, a plaintiff *must* show that she is otherwise qualified with or without reasonable accommodation. To establish the second element of the latter case, the plaintiff may establish *either* (1) that she is qualified without an accommodation, or (2) that she is qualified with an alleged essential job requirement eliminated, or (3) that she is qualified with a reasonable accommodation; in such cases where the plaintiff has proposed the elimination of an alleged essential job requirement, the second option is often not genuine in dispute, making it is easy for the plaintiff to establish the second element. This easy path to establishing the second element of an indirect-evidence *prima facie* case of general disability discrimination is never available to plaintiffs, however, meaning that it is often not nearly as easy to establish such a case as it to establish a *prima facie* case of failure to accommodate.

reasonable accommodation. (Doc. No. 25 at 21). Defendant premises this argument on the above-referenced argument that Plaintiff cannot perform an allegedly essential function of the job, *i.e.*, work 70-hours hours and six days a week. This time, unlike with the same argument Defendant made in connection with Plaintiff's failure-to-accommodate claim, it was proper for Defendant to direct the argument at Plaintiff's *prima facie* case.[21] But the argument's premise is flawed, in the Court's view; for the reasons discussed above, the Court finds that Plaintiff has shown there is a genuine dispute as to whether 70-80-hour, six-day work weeks are an essential function of a Production Supervisor.

Proceeding alternatively to the second step, Defendant contends that "[e]ven if the Court were to find that Plaintiff has established a *prima face* case of disability discrimination, her claim would still fail because [Defendant] has articulated a legitimate, non-discriminatory reason for her termination." (Doc. No. 25 at 22). Defendant states that Plaintiff was terminated because she "was unable to return to work and she had exhausted her available leave" not because she was an individual with a disability. (*Id.*). As evidence of this, Defendant notes that its leave-of-absence policy allows employees up to 12 weeks of FMLA leave in a single year (Doc. No. 27-1 at 62), and that Plaintiff was aware of this policy. (*Id.* at 19-20). It is undisputed that Plaintiff had used up her three months of available leave by the time she met with Defendant's representatives to discuss her accommodations. Defendant cites to the deposition testimony of Denton where he says Plaintiff was terminated because Defendant could not place her into a position, and she had exhausted all of her leave. (Doc. No. 27-3 at 14). Defendant also cites to a similar proposition from

---

[21] As reflected in a footnote immediately above, the argument that the plaintiff is not qualified with or without reasonable accommodation can be far more effective in challenging an indirect evidence *prima facie* case of general disability discrimination than in challenging a *prima facie* case of failure to accommodate, which does not necessarily require a showing that the plaintiff is not qualified with or without reasonable accommodation because it provides the plaintiff two alternatives to doing so.

Al-Saadawi's deposition where he responds that he knew Plaintiff would be terminated during their meeting "[b]ecause she pretty much -- she cannot work on B-Shift at all, and she exceeded her time of leave based on the policy." (Doc. No. 27-4 at 11). The Court finds that this cited evidence is sufficient for Defendant to be deemed to have met its burden of production of showing a legitimate, non-discriminatory reason for Plaintiff's termination.

For this reason, Defendant survives to the third step, at which the burden shifts to Plaintiff to show a genuine dispute as to whether or not Defendant's stated reason is pretextual, and whether the real reason is discriminatory in nature.

In *Benitez*, the undersigned further explained,

[O]nce the burden has shifted back to the plaintiff, the plaintiff must show by a preponderance of the evidence each of two components of pretext: that the defendant's reasons (i) were not its true reasons and (ii) were instead actually a pretext for discrimination." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 661 (6th Cir. 2020)). To defeat a summary judgment motion in such circumstances, the plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him. *Braithwaite v. Tinken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

An employee can show pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014).

. . .

In some cases, the evidence that the defendant's proffered reason was not the proffered reason will serve equally as evidence that the real reason was discriminatory, and vice versa. After all, evidence may suggest that the defendant's proffered (non-discriminatory) reason was not the real reason precisely because it suggests that the real reason was discriminatory; likewise, evidence may suggest that the defendant's proffered (non-discriminatory) reason was discriminatory precisely because it suggests that (suspiciously) the proffered reason was not the real reason.

2022 WL 58399 at *20.

To demonstrate pretext, Plaintiff first notes the undisputed fact that prior to her January 18th meeting with Defendant's representatives, she had requested additional leave until February 4, 2019. Plaintiff points to evidence that this request had been approved, including a copy of her Leave of Absence application, which shows it was signed for approval by Scott Kuck. (Doc. No. 31-10 at 15). Additionally, Plaintiff points to an email from Audrey Shepard to Kuck and Lisa Luckett (Defendant's Benefits Coordinator, "Luckett"), which says, "Attached is an LOA Letter for [Plaintiff] who is expected to return on 2/4/2019. This letter was mailed from Corporate. Please file this letter in [Plaintiff's] Personnel File." (Doc. No. 31-14 at 1). Then, Plaintiff cites to an email from Joyce Brannon to Luckett discussing Plaintiff's termination, where Brannon says "I was told she had an extension until 02/01/19, so I am confused. SAP says she was terminated for not coming to work? Is this going to be changed or is it correct?" (Doc. No. 31-17 at 1).[22] Finally, Plaintiff argues that evidence she has cited in support of her previously-discussed claims could also allow a reasonable jury to find Defendant's stated reason for termination was pretextual, including: Defendant not considering the rotational policy as a potential way to accommodate Plaintiff, Defendant's refusal to allow Plaintiff to meet with her provider to reconsider her accommodation requests, and Kuck's proposal of alternative jobs that were not really options (such as the interpreter position, which Plaintiff was not qualified for).

The Court believes Plaintiff has pointed to sufficient evidence, namely the fact that Plaintiff's additional request for leave had been approved (at least in some sense, even if Defendant

---

[22] In this cited evidence, there are references to Audrey Shepard, Joyce Brannon, and SAP. Plaintiff provides no context for who these individuals are, nor what SAP is. And despite reviewing all cited evidence and both parties' Statement of Facts, the Court cannot glean who Shepard or Brannon is, nor what SAP is. Nonetheless, in keeping with the standard of review on a motion for summary judgment, the Court draws all inferences in favor of the nonmovant (Plaintiff) and infers these individuals and SAP are both relevant and beneficial to Plaintiff's argument.

would characterize such approval as a "mistake"), from which a reasonable jury could determine Defendant's stated reason for terminating her (that she had used up all her leave and was unable to return to work) was not the real reason. This means Plaintiff has satisfied one of the requirements—that Defendant's stated reason was not true—of showing a genuine dispute as to pretext. As to the other requirement—that the real reason was discriminatory in nature—the Court believes that in this case "the evidence that the defendant's proffered reason was not the proffered reason [] serve[s] equally as evidence that the real reason was" Plaintiff having a disability. *Benitez*, 2022 WL 58399 at *20. The Court so concludes because if (as the jury would be authorized to conclude the evidence suggests) Defendant's stated reason for terminating Plaintiff is untrue, that leads to the questions of what the real reason for Plaintiff's termination was and why Defendant would seek to cover it up by purporting a disingenuous different reason. It is at least inferable based on the rest of the evidence presented by Plaintiff that the real reason was grounded in discriminatory animus—that if Defendant felt compelled to offer a pretextual reason, it was driven by the need to hide a reason steeped in discriminatory animus. Because the Court cannot draw (on the record before it) an indisputable conclusion one way or the other as to why Defendant terminated Plaintiff, it holds that it should be left to the jury to decide whether Defendant's proffered reason was pretextual and whether the real reason was disability-based animus. The Court does not venture to say that a reasonable jury *should or would* answer both of these questions in the affirmative, but rather ventures to say only that the instant record reveals that it *could* do so.

Accordingly, Defendant's Motion will be denied as to Plaintiff's claim for disability discrimination.

**IV. Retaliation**

Defendant's final challenge to Plaintiff's first cause of action is to Plaintiff's claim for retaliation under the ADA/ADAAA. The Complaint fairly can be construed to raise a claim of retaliation[23]—more specifically the claim that she suffered an adverse employment action (termination) as a result of her engaging in protected conduct (requesting accommodations for her disability). "Under the ADA's retaliation provision, it is unlawful to 'discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA].'" *Chaniott v. DCI Donor Servs., Inc.*, 481 F. Supp. 3d 712, 727 (M.D. Tenn. 2020) (quoting 42 U.S.C. § 12203(a)). "'[R]equests for accommodation are protected acts' for the purposes of an ADA retaliation claim." *Id.* (quoting *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422 (6th Cir. 2015)).

As suggested above, retaliation in violation of federal employment discrimination statutes generally (and certainly in the case of the ADA/ADAAA) can be proven either by direct evidence or by indirect evidence. *Swanton v. Wyndham Vacation Resorts, Inc.*, No. 3:20-CV-00480, 2021 WL 5744708, at *8 (M.D. Tenn. Dec. 1, 2021) (citing *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 79 (6th Cir. 2020)). "Direct evidence is such that, if true, requires the conclusion that unlawful

---

[23] As indicated above, paragraph 38 of the Complaint fairly can be construed to assert such a claim. And the immediately preceding paragraph of the Complaint is clear that she is alleging retaliation for her having requested accommodations. (Doc. No. 1 at 6) ("Plaintiff was subjected to a hostile work environment, and in retaliated against due to her disability and due to requests for reasonable accommodation."). At first blush, Plaintiff here appears to allege that she was retaliation against due to *both* her being a person with a disability *and* her having requested for accommodation. But it would be nonsensical to claim that she was *retaliated* (as opposed to discriminated) against due to her disability. A discrimination (including hostile work environment) claim can be (and typically is) based on protected status (such as having a disability), but a retaliation claim must be based on protected conduct (such as requesting an accommodation). So Plaintiff's sentence cannot sensibly be construed to allege *retaliation* based on her having a disability; instead, to make legal sense, it must be only the alleged *hostile work environment* that is based on her disability.

retaliation was a motivating factor without any inferences or presumptions." *Banks v. Bosch Rexroth Corp.*, 15 F. Supp. 3d 681, 693 (E.D. Ky. 2014), *aff'd*, 610 F. App'x 519 (6th Cir. 2015) (citing *Norbuta v. Loctite Corp.*, 181 F.3d 102 (6th Cir. 1999)). But Plaintiff does not offer any direct evidence that she was retaliated against (via the adverse employment action of termination) based on protected conduct; that is, she does not offer any evidence that would require the conclusion, without resort to the drawing of inferences, that her termination was prompted by her having requested an accommodation for her disability. Though Plaintiff's Response states, "[I]t is [Plaintiff's] contention that pretext is largely irrelevant because her termination is premised on a failure to accommodate which is a direct evidence standard," (Doc. No. 29 at 25), she simply cites to no evidence that would "require the conclusion that unlawful retaliation was a motivating factor" for her termination. *Banks*, 15 F. Supp. 3d at 693. As Defendant appropriately puts it, "[t]here is no direct evidence of retaliatory animus in the record, therefore Plaintiff must try to prove her retaliation claim indirectly." (Doc. No. 25 at 23). In other words, she is relegated here to an indirect-evidence theory.

Defendant first argues that

> Plaintiff's retaliation claim is a repackaging of her failure to accommodate claim and it should be dismissed consistent with this Court's holding in *Wyatt*, 2019 WL 6682197, at *16.

> In *Wyatt*, this Court found that a failure to accommodate cannot constitute retaliation for an employee's request for accommodation. *Id.* As this Court explained, requesting an accommodation inevitably carries the possibility that the employer will reject the request. *Id.* As a result, if the alleged retaliatory acts constitute nothing more than the way in which the defendant rejected Plaintiff's accommodation requests, those requested accommodations cannot serve as the basis of a retaliation claim. *Id.*

(Doc. No. 25 at 24). But *Wyatt* is distinguishable because, contrary to Defendant's implication, the alleged retaliatory act in the present case does *not* "constitute [] nothing more than the way in

which the defendant rejected Plaintiff's accommodation requests." *Wyatt v. Nissan N. Am., Inc*., No. 3:17-CV-1545, 2019 WL 6682197, at *16 (M.D. Tenn. Dec. 6, 2019), *aff'd in part, rev'd in part and remanded*, 999 F.3d 400 (6th Cir. 2021). In *Wyatt*, the plaintiff claimed she was experiencing retaliation for having requested reasonable accommodation and her examples of retaliatory actions included: demanding additional documentation of her need for accommodations, harassing her about her medical needs, and no longer accommodating her requests. *Id.* at *2. In viewing those allegations of retaliation, the undersigned explained, "[E]ach of Defendant's alleged ADA retaliatory actions constitute, in essence, nothing more than a particular way Defendant allegedly refused to honor Plaintiff's requests for reasonable accommodations. And alleging that these actions were in retaliation for her requesting accommodations is simply a 'repackaging' of her failure to accommodate claim." *Id.* at *16. Defendant also cites *Pinto v. New York City Admin. for Children's Servs.*, where the plaintiff tried to argue that a failure to accommodate her constituted ADA retaliation, and the court rejected that position. No. 18-CV-1852 (KBF), 2018 WL 4333990, at *11 (S.D.N.Y. Sept. 11, 2018).

The facts in *Wyatt* and *Pinto* are simply different from the facts here. In the present action, the act of retaliation Plaintiff alleges was not Defendant's refusal to provide her requested accommodations, but rather was Defendant's *termination* of her from her position as a Production Supervisor. (Doc. Nos. 1 at 5, 29 at 25). Because Plaintiff alleges that she *was terminated* because of her request for accommodation, not merely that Defendant declined to grant her an accommodation and that this *in turn* led effectively to her termination, her claim avoids the problem of *Wyatt* and *Pinto*.

However, Defendant can (and does) still challenge Plaintiff's retaliation claim on the (alleged) basis that it was unable to accommodate her, which *in turn* led to—was the legitimate

and non-retaliatory reason for—her termination. This line of reasoning is the foundation of Defendant's second argument against Plaintiff's retaliation claim.

Defendant here does not appear to contest that Plaintiff can establish a *prima facie* case of ADA retaliation. Thus, skipping over step one, Defendant proceeds directly to step two (and, simultaneously, step three), asserting that it "had a legitimate, non-retaliatory reason for her termination that is not pretextual." (Doc. No. 25 at 24). As for the second step, Defendant (unsurprisingly) asserts the same alleged reason for Plaintiff's termination as discussed above, implying that it is (in addition to being legitimate) non-retaliatory just as it is non-discriminatory. With respect to Plaintiff's retaliation claim, as with her discrimination claim, the Court finds that Defendant has met its burden of production.

Addressing step three, Defendant asserts that "Plaintiff is unable to establish that [Defendant's] legitimate, nonretaliatory [sic] reason for its actions was a pretext for retaliation." (Doc. No. 25 at 23). Defendant offers no argument on step three with respect to Plaintiff's retaliation claim beyond what it offered at step three with respect to Plaintiff's discrimination claim. Similarly, Plaintiff utilizes the same argument for establishing a genuine dispute at to pretext in her retaliation claim as she did above in her disability discrimination claim.

As the Court concluded above, a reasonable jury could find that Defendant's proffered reason was not the actual reason for Plaintiff's termination. And just as the Court found above that a reasonable jury also could conclude that *discriminatory* animus was the real reason for Plaintiff's termination, it finds here that a reasonable jury could determine that the real reason was *retaliatory* animus against Plaintiff for having requested an accommodation for her disability.[24] It is at least

---

[24] One reasonably may ask whether it is appropriate for a Plaintiff to argue, and the Court to find, both that (i) a jury reasonably could find that the real reason for an adverse employment action was *discriminatory* in nature; and (ii) a jury reasonably could find that the real reason for an adverse employment action was

inferable based on the rest of the evidence presented by Plaintiff that the real reason was grounded in retaliatory animus—that if Defendant felt compelled to offer a pretextual reason, it was driven by the need to hide a reason steeped in retaliatory animus. Because the Court cannot draw (on the record before it) an indisputable conclusion one way or the other as to why Defendant terminated Plaintiff, it holds that it should be left to the jury to decide whether Defendant's proffered reason was pretextual and whether the real reason was retaliatory animus. Again, the Court does not venture to say that a reasonable jury *should or would* answer both of these questions in the affirmative, but rather ventures to say only that the instant record reveals that it *could* do so.

Accordingly, Defendant's Motion will be denied as to Plaintiff's claim for retaliation under the ADA/ADAAA.

## V. Remaining Claims

In her Response, Plaintiff indicates she is voluntarily dismissing her second and third causes of action, brought under the TDA and FMLA respectively. (Doc. No. 29 at 2). The Court is constrained to note, as a technical matter of proper procedure, that a plaintiff cannot unilaterally *dismiss* claims after the opposing party has filed a summary judgment motion. *See* Fed. R. Civ. P.

---

*retaliatory* in nature. After all, these two reasons conflict with one another to a degree; it is one thing to take adverse action against employee because she is in a protected *class*, and it is another to take adverse action against her because she engaged in protected *conduct*. Suffice it to say, however, that courts regularly approve this approach, allowing a plaintiff to survive summary judgment on both of these alternative theories as to the real reason for the adverse action. *See e.g. Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007) (reversing summary judgment when there was a question as to pretext for both an FMLA retaliation and disability-retaliation claim); *Pigott v. Battle Ground Acad.*, 909 F. Supp. 2d 949, 962 (M.D. Tenn. 2012) (holding that a fact issue existed as to whether the defendant's proffered reason for terminating the plaintiff was actually pretext for retaliation for making complaints of age discrimination *and* for age discrimination itself); *Finch v. Xavier Univ.*, 689 F. Supp. 2d 955, 965 (S.D. Ohio 2010) (holding that there was sufficient evidence on the question of pretext for both an age discrimination and retaliation claim based on an individual's termination to proceed to the jury). The Court will do likewise here because it finds that a reasonable jury could find either discrimination or retaliation was the actual reason for the Defendant's adverse employment action. The Court declines to comment on the ramifications at trial of any theory suggesting that the real reason was a *combination* of anti-disability animus and retaliatory animus.

41(a)(1)(A)(i). However, a plaintiff can *abandon* claims by not responding to a motion for summary judgment on those claims. The Sixth Circuit has stated:

> This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment. *See Hicks v. Concorde Career Coll.*, 449 Fed. Appx. 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 Fed. Appx. 522, 524–25 (6th Cir. 2006) (recognizing that the failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim); *Conner v. Hardee's Food Sys.*, 65 Fed. Appx. 19, 24–25 (6th Cir. 2003); *see also Colston v. Cleveland Pub. Library*, No. 1:12–CV–204, 2012 WL 3309663, at *2 n. 2 (N.D. Ohio Aug. 13, 2012) (deeming a claim abandoned and granting summary judgment when a plaintiff "did not respond or even mention [the] claim in her opposition to Defendants' motions for summary judgment").

*Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). Here, Defendant moved for summary judgment on all of Plaintiff's claims, including those brought under the TDA and FMLA (encompassed in Plaintiff's second and third causes of action). As Plaintiff responded only to Defendant's arguments attacking her claims under the ADA (encompassed in her first cause of action), the Court determines she has abandoned her remaining claims, and summary judgment will be granted to Defendant on those claims.

## CONCLUSION

For the reasons discussed herein, Defendant's Motion will be **GRANTED in part** and **DENIED in part**. Specifically, Defendant's Motion is granted as to Plaintiff's claims contained in her second and third cause of action, and it will be denied as to Plaintiff's claims for failure to accommodate, disability discrimination, and ADA retaliation contained in her first cause of action. Additionally, to the extent Plaintiff intended to allege a claim for failure to engage in the interactive process in her first cause of action, this "claim" will not proceed as the Court has determined that this putative claim actually is not cognizable as an independent cause of action under the ADA.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE